UNITED STATES v. BOSTON, C. C. & N. Y. CANAL CO. et al.

(Circuit Court of Appeals, First Circuit. February 16, 1921.)

No. 1485.

1. **Eminent domain** ⊜⟹202(1)—In suit for condemnation of canal, evidence of cost of reproduction admissible.

In a suit by the United States for condemnation of a canal, evidence of the value of the land included on the right of way at the time of commencement of the suit, assuming that the canal had not been built, *held* admissible as bearing on the cost of reproduction.

2. **Eminent domain** ⊜⟹202(1)—Evidence as to earning capacity of canal not competent.

In a suit for condemnation of a canal, evidence of a proposed contract with a steamship company respecting tolls, as bearing on the potential value of the property, *held* not competent, where the contract was not executed.

3. **Evidence** ⊜⟹486—Future earnings of canal not proper subject of opinion evidence.

In a suit by the United States for condemnation of a canal used for interstate traffic, the probable future towage of the canal and the addi-

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tional revenue to be derived, in view of such increased tonnage, *held* not a proper subject of opinion evidence.

**4. Eminent domain ⊛⟹202 (1)—Evidence of cost of reproduction under abnormal conditions not admissible.**

In a suit by the United States for condemnation of a canal, evidence of the cost of reproduction at the time of commencement of the suit, when, owing to war conditions, such cost was abnormally increased, *held* not admissible as an element of value to be considered, unless reproduction at such enhanced cost would be a reasonable commercial investment, a fact to be either determined by the court as a preliminary or submitted to and found by the jury.

**5. Eminent domain ⊛⟹134—Peculiar value of property to party asking condemnation not element of market value.**

In ascertaining the market value of property taken in a condemnation proceeding, the utility or availability of the property for the special purpose of the taker cannot be shown, if the taker is the only party who can use it for that purpose.

**6. Eminent domain ⊛⟹262 (5)—Error in admission of evidence not cured by instruction.**

In a suit by the United States for condemnation of a canal, the admission, on the issue as to the value of the property, of the testimony of high officers of the army and navy that the property was of great value, and even necessary for military and naval purposes and for national defense, *held* error, and where the testimony was not withdrawn, and such facts were argued at length to the jury as enhancing the value of the property, the error *held* not cured by a brief instruction that its peculiar value to the government for such purposes should not be considered.

**7. Eminent domain ⊛⟹126 (1)—Elements entering into valuation of public utility; "going value."**

In ascertaining the fair value of a public utility in a proceeding for its condemnation, apart from its franchise, consideration is to be given to the value of its physical property, including preliminary and overhead costs necessary to prepare the plant for service, and also to the sums actually and fairly expended in creating the business and revenue of the enterprise, or what is generally known as the "going value" of the concern, provided the business has been profitable or there is a reasonable probability of its becoming so.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Going Value.]

**8. Eminent domain ⊛⟹202 (1)—Elements entering into valuation of property.**

In ascertaining the value of a canal in a proceeding for its condemnation, evidence of the amount of stock and bonds of the canal company paid for rights, franchises, and services, largely by the construction company, to which they were issued under its contract, and including a payment made for organizing a syndicate for floating the bonds, *held* improperly received, especially where there was no evidence of the actual market value of the stock and bonds so used, or to show what items of the total expenditure were proper items of construction costs.

**9. Eminent domain ⊛⟹241—Suit for condemnation of Cape Cod Canal; form of judgment.**

In a suit by the United States for condemnation of the Cape Cod Canal under Act Aug. 8, 1917, the court *held*, under the pleadings and verdict, without authority to enter any judgment, except the conditional judgment provided for by the statute.

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

⊛⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Petition for condemnation by the United States against the Boston, Cape Cod & New York Canal Company and others. From the judgment, the United States brings error. Judgment vacated, and cause remanded.

Nathan Matthews, of Boston, Mass. (Francis G. Goodale and Daniel J. Gallagher, both of Boston, Mass., and A. Mitchell Palmer, of Washington, D. C., on the brief), for the United States.

Sherman L. Whipple, of Boston, Mass. (Frederic B. Greenhalge, of Boston, Mass., Garrard Glen, of New York City, and Currier & Young, of Boston, Mass., on the brief), for defendants in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This proceeding was begun April 1, 1919, in the District Court for Massachusetts under the Act of August 1, 1888 (25 Stat. at Large, 357 [Comp. St. §§ 6909, 6910]), and the River and Harbor Act of August 8, 1917 (40 Stat. at Large, 250), for the condemnation of certain land and appurtenances constituting the Cape Cod Canal. In the petition the terms of the Act of August 8, 1917, are set forth, the government's compliance with the same, a description of the premises sought to be condemned, and an assertion, on information, that the only parties interested in the property are the Boston, Cape Cod & New York Canal Company and the Old Colony Trust Company, and, after requesting a determination of the value of the property by a jury, it prays that upon proof to the court that the amount of the verdict has been paid or tendered by the United States to the persons entitled, or upon the payment of the same into court, a decree be entered that the fee of the land and appurtenances shall thereupon be vested in the United States.

May 14, 1919, the Canal Company filed its answer, alleging that it was the sole owner of the property described in the petition and requested full compensation therefor.

May 22, 1919, the Old Colony Trust Company filed its answer setting up a mortgage on the property dated January 1, 1910, for the sum of $6,000,000 and asking that its rights be protected and compensation paid to it on the amount of its interest in the property to be taken.

In October and November, 1919, trial was had before a jury. On the question being raised as to the title of the Canal Company it was stipulated, on the 18th of November, 1919, that the only issues to be submitted to the jury should be (1) the value of the property and franchise sought to be condemned, and (2) the amount fairly and reasonably chargeable to the Canal Company on account of dredging and other work done by the United States while the canal was in the control of the United States Railroad Administration, so far as it did not relate to current maintenance.

November 18, 1919, a verdict was returned as follows:

"The jury find that on April 1, 1919, the date of the filing of the petition for condemnation, the Boston, Cape Cod & New York Canal Company was the owner in fee simple of the property and franchise sought to be condemned, and that on said date the value of the property and franchise, estimating the

same as an entire estate and as if it were the sole property of one owner in fee simple, was the sum of sixteen million eight hundred and one thousand two hundred and one and eleven-hundredths ($16,801,201.11) dollars."

At the same time the jury rendered a special verdict, in which they found that the amount reasonably chargeable to the Canal Company on account of the dredging above referred to was $150,000, which, under the stipulation, was to go in reduction of the general verdict.

On the 31st of August, 1920, a judgment of condemnation was entered as of August 3, 1920. The judgment recites the giving of notice, describes the property sought to be condemned, and refers to the appearances of the Canal Company and the Old Colony Trust Company, and to the assertions of title in their respective answers; also to the appearances of certain other parties, to the agreement as to the issues to be tried by the jury, and to the verdicts of the jury, general and special. It then adjudged that on the 1st of April, 1919, the Canal Company was, "except for the rights which the United States may have acquired therein and the rights of the claimant, Old Colony Trust Company, as trustee, sole owner in fee simple of the land, interest, appurtenances and other property hereinbefore described; that the value of the same on that date was $16,801,201.11; that the amount fairly and reasonably chargeable to the Canal Company on account of dredging, etc., was the sum of $150,000; "and that, of said resultant sum of $16,651,201.11, if paid, the Boston, Cape Cod & New York Canal Company shall receive $10,076,701.11, and the Old Colony Trust Company, trustee, shall receive $6,574,500." It was further ordered that, upon payment into the registry of the court by the United States within a reasonable time after the date of the decree of the sum of $16,651,201.11, "the fee to said land hereinbefore described and to all rights, etc., * * * therein, if not already so vested, shall vest in the United States of America, to have, hold, possess, and enjoy for its use forever; but, if within a reasonable time said sum is not paid into the registry of the court, such further order may be made in this proceeding for dismissal or otherwise as justice may require, and the Boston, Cape Cod & New York Canal Company and the Old Colony Trust Company, trustee, and each or either of them, may pursue in such form and in such court as they or it may be advised their or its remedy or remedies against the United States upon the claim of ownership by the United States of said canal and its appurtenances, as set forth in the Canal Company's said petition for judgment, without prejudice by this decree except so far as said claim shall, if at all, have become res judicata by this proceeding."

It appeared in the case that, pursuant to the proclamation of the President of July 18, 1918, the control of the canal was taken over by the United States on July 25, 1918, as a war measure; that the government was in possession and control of the canal at the time the petition for condemnation was filed and the trial was had, and remained in such control down to March 1, 1920, when it was turned back to the Canal Company.

March 1, 1920, the Canal Company filed in the District Court a document entitled "Petition for Entry of Judgment," in which it set out

that on the 25th of July, 1918, the President, through the Secretary of War, took possession of the canal pursuant to the authority conferred by section 1 of the Act of Congress of August 29, 1916 (Comp. St. § 1974a). It alleged that neither the proclamation nor the act contained any provision for the return of the property or limited the power of the President to take and acquire less than the whole property or required the President to take only the use thereof for a limited time; that since July 25, 1918, the canal and its appurtenant property had remained continuously in the possession and under the control of the Director General of Railroads and had been completely and exclusively sequestered for public uses; that prior to the date of the taking by the President on July 25, 1918, to wit, on August 8, 1917, Congress enacted legislation which authorized the condemnation proceedings; and that, at the time when the canal was taken by the President, proceedings had already been instituted under the Act of August 8, 1917; that the engineers had made their report, the Secretaries named had considered the report and recommended that the canal be acquired by the government, and the Secretary of War had undertaken negotiations with its owner for the purchase of the canal, which negotiations had failed, and the Secretary of War had caused the Attorney General to file the condemnation proceedings. It was further alleged that the act of Congress under which the President had taken over the canal contained no provision for procedure for the recovery of the value by the owner; that therefore there arose on the part of the government an implied obligation to pay the fair value thereof; that the "petition for condemnation had and could have no other object except the single one of having determined by a jury at the bar of this honorable court the fair value of said canal and its appurtenant property and just compensation to be paid to the former owner thereof by the government." After setting out other matters unnecessary to relate, it prayed that judgment be entered "either that the United States shall pay to your petitioner as compensation for its canal and appurtenant property taken as heretofore set forth and applied to public uses, the amount of the verdict heretofore found by the jury and accepted by the court, or in such other form as upon hearing of the facts this honorable court shall deem proper and appropriate." In other words, the Canal Company by its petition, sought to obtain an absolute judgment for a fixed sum rather than a conditional one as called for by the act of 1917, and this is the petition which is referred to in the judgment that was entered.

From the judgment of August 31, 1920, the government prosecuted this writ of error. In its assignments of error it complains that the court erred (1) in the admission of evidence; (2) in its charge to the jury; (3) in its refusal to grant certain requests for instructions; and (4) in the substance and form of the decree entered.

The Canal Company was incorporated June 1, 1899 (Stat. Mass. 1899, c. 448). By the charter it was authorized to build and operate a canal across a strip of land on Cape Cod lying in Sandwich and Bourne and extending a distance of some 8 miles. The charter depth of the canal was to be 25 feet at mean low water, and its width at

271 F.—56

the bottom 100 feet, and the company was authorized to collect tolls for its use. It was authorized to issue $6,000,000 of stock and $6,000,-000 of bonds to raise money for the acquisition of a right of way and the construction of the canal. It could issue the stock and bonds only upon certificates of the board of harbor and land commissioners that a proportionate amount of the entire work had been done to justify the issue, and could issue the balance of the stock and bonds when the work was completed.

The evidence disclosed that the company had complied with the terms of its charter and at the time of the trial had become the owner of the canal and entitled to the privileges and franchises which the Legislature had granted.

The purpose of the canal was to afford a short passage for coastwise shipping, and, at the same time, avoid the dangers of navigation encountered by vessels in the passage around Cape Cod. The course taken by vessels prior to the building of the canal was through Pollock Rip Slue, which was one of the most dangerous on the Atlantic coast. The evidence showed that by use of the canal the dangers of navigation were greatly reduced and that there was a saving in distance of about 60 miles It also appeared that the canal offered a safe passage for "box" barges, which could not be towed around the Cape, and that, as a result of the opening of the canal this type of barge had increased in number and their use had brought about substantial economies in the expense of shipping; also that passenger steamers plying between Boston and New York could be operated more safely and reliably through the canal.

On July 3, 1914, before the canal was completed, it was opened for vessels drawing not over 12 feet. In April, 1916, the canal was completed with a depth of 25 feet and was opened generally for business. As the United States took over the canal on July 25, 1918, for war purposes, the company was permitted to operate it after its completion (in April, 1916) for a period of about 2 years, and during 6 months of this time it was closed on account of the sinking of a vessel in the canal and the frozen condition of Buzzards Bay. The World War broke out in 1914, and this country entered the war in April, 1917. The breaking out of the war caused a stringent and uncertain financial condition, and our entrance into the war resulted in withdrawing shipping from its ordinary commercial routes and into routes made necessary by the activities of war, much to the detriment of the canal as a financial enterprise. The steamships of the Eastern Steamship lines were the canal's best patrons and contributed about one-third of its income, but the best of its steamers passing through the canal were taken over by the government, and this caused a loss of revenue. The number of vessels making use of the canal from its opening, November 5, 1914, down to the time of the trial, materially increased, with the exception of 1917, when we entered the war. The tolls, however, which it charged, remained the same, notwithstanding the operating costs of the canal and everything that had to do with shipping greatly increased.

[1] The first assignment of error relates to the reception of evidence given by Charles L. Gifford, a real estate expert familiar with the value of lands in the vicinity of the canal, who gave his opinion as to the value of the land April 1, 1919, included in the canal right of way, assuming that no canal had been built. We see nothing in the exception to this evidence that calls for special comment. It was offered as bearing upon the cost of reproducing the canal as of the time in question, and there was no evidence or suggestion that land values in that vicinity were abnormal. We do not think the surrounding conditions affecting the canal property and other property in the neighborhood had so changed at the time of trial as to render this element of cost merely speculative.

[2] The second assignment relates to the reception of evidence offered through one Calvin Austin of the Eastern Steamship Company. It appeared that in the fall of 1916 Austin, as president of the Eastern Steamship Company, agreed with the president of the Canal Company upon a proposed contract relative to tolls for the year 1917; that the terms of the contract were subsequently reduced to writing and signed by the Canal Company, but not by the Steamship Company, as Austin testified that he was not authorized by the board of directors to sign it. The terms of this proposed contract were put in evidence, subject to exception, as bearing upon the useful or potential value of the canal property.

We think that, inasmuch as the evidence disclosed that the Steamship Company had never sanctioned the proposed contract, the evidence was inadmissible, and that the court erred in receiving it.

The third assignment relates to the admission in evidence of a contract entered into between the Canal Company and the Construction Company providing for the construction of the canal and payment therefor in the stocks and bonds of the Canal Company. The grounds of the objection were that the evidence was incompetent for the purpose of showing the value of the canal property, inasmuch as the cash or market value of the stocks and bonds was not shown. The difficulty with this assignment of error is that the evidence was not offered, received, or used for the purpose of showing the value of the property, but for the purpose of showing the history of the enterprise. On what theory the evidence as to the history of the enterprise was deemed competent is not clear; but, as no exception was saved to its admission, we do not discuss the question.

[3] The fourth assignment relates to the admission in evidence of the testimony of Emory R. Johnson, offered by the Canal Company, concerning the probable future growth of the traffic through the canal and its earnings, as bearing upon the value of the canal property.

Mr. Johnson qualified as an expert on the history and theory of canal transportation, and as having special knowledge of canals and inland waterways, both in this country and in Europe, with reference to the amount of business they did and the tolls charged. Having testified that the total gross tonnage passing around the Cape in 1909 was 26,465,000 tons, and that the gross vessel tonnage per annum during the war which passed through the canal and coastwise was

18,108,893 tons, he was asked what, in his opinion, the future coast-wise traffic would be, and he said that he predicted the coastwise traffic would return to normal within three years and, assuming the tonnage would be 26,000,000 in 1923, it would reach 34,500,000 tons in 1933, if the increase in a decade is only one-third; that that rate of increase would carry the figures to 46,200,000 tons in 1943, 20 years after the period of return to normal; and that the traffic for the years 1943–44, assuming this rate of increase, would be 47,357,000 tons. On being asked how much of this traffic would use the canal, the witness said:

"The most reliable estimate that I can make of the future growth of the traffic of a canal like the Cape Cod Canal is by predicting for it such a rate of increase as has actually been experienced by canals who have run their history for 20, 30 or 40 years, whose history is a matter of record. * * * The best method I know of to estimate the probable development of a canal like the Cape Cod Canal is to consider—and I shall be very brief about it—the actual experience of some other canals, and I have selected the Suez, the Manchester and the Kiel Canals."

At this point counsel for the government objected to the admission of the testimony, claiming that the conditions relating to the canals spoken of by the witness were wholly dissimilar. The court declined to allow the witness to continue with his answer, saying that he was "inclined to think that the Suez Canal * * * [was] so differently situated in many points that [he was] not disposed to allow direct evidence in regard to it for purposes of comparison." Later the witness was asked:

"What is your estimate of the future use of the canal, assuming that its dimensions are substantially as they now exist; that is, a 25-foot canal, with 100 feet width at the bottom?"

He answered:

"The prediction as to the future traffic of the canal was based upon the assumption, first of all, that the available traffic, coastwise, would increase 33$\frac{1}{3}$ per cent. per decade after that traffic had again become normal in volume; that is, from 1923 on. That carries the total available traffic up to 46,200,000 tons in 1943. The problem to be solved in making an estimate of the probable traffic of the Cape Cod Canal is to determine what rate—what would be the normal rate of increase in traffic of a canal such as the Cape Cod Canal. Now, I do not think that there is any way of arriving at a normal rate of increase so reliable, at least, not to my mind so reliable, as the average rate of increase of other canals that have gone through their early years of experiment, their early years of slow growth, and through their later years of fair prosperity. So I have predicted for the future of the Cape Cod Canal a rate of increase equal to the average rate of increase of the Suez, which increased slowly for 10 years. * * *

"Q. Without going into that, if you will state what your prediction is, being based upon your study of canals in general, because, you see, Mr. Matthews has got it in for the Suez Canal. * * *

"Q. So, if you will just state from your knowledge of canals in general, then you will get by the objection. A. I will finish the sentence at least. The other two canals I had in mind were the Manchester, which grew very slowly, and the Kiel Canal. I applied the average rate of increase for those canals to the traffic of the Cape Cod Canal, starting the line from 1919—I talk in terms of lines, because one thinks graphically—and carried that line, which merely locates graphically the figures, through to 1943, and the figures run as follows."

At this point counsel for the government interposed an objection, stating that the facts relating to the Suez, Kiel, and Manchester Ship Canals had been ruled out, and that it appeared from the witness' last statement that the answer he was about to give was predicated solely on that comparison. The court sustained the objection so far as it related to the witness undertaking to give a mere summary of the results in those canals, but allowed him to state his opinion as to the future business of this canal, saying, "He can arrive at that in any way he thinks proper;" that the witness might testify "as to his opinion, and it is his affair and the jury's as to whether that opinion is founded on rock or sand." To this ruling counsel for the government saved an exception. Counsel for the Canal Company then premised his question with the following statement:

"I want to make that, in view of the exception, very explicit, that I am not asking for a comparison with any other canals or average in canals as such.

"Q. What his honor has said is proper to submit to the jury is your opinion. Your methods of having reached it are inconsequential so long as it is your opinion, and what Mr. Matthews objects to, apparently, is the way you reach your opinion, and very likely he will cross-examine you about it, and show that it is an improper way to reach your opinion. I should like to see him do it. I hope he will. But in the absence of that I understand his honor to rule that you may state your opinion, and you have already indicated that you have considered in making that opinion all the knowledge that you have in regard to canals, which seems to be rather larger than most of us have. A. My opinion, then, is that the traffic of the Cape Cod Canal 10 years hence will be 7,700,000 tons of vessels gross register. * * * I wish to correct that statement; I was in error. I misread my figures here. I will read them correctly now. At the end of 10 years of operation of the canal, which means 5 years hence, the prediction is 7,700,000 tons gross register; 10 years hence, 9,900,000 tons; fifteen years hence, 11,700,000; 20 years hence, 14,500,000 tons; 25 years hence, 16,800,000 tons—in all cases gross tonnage."

The witness then testified that he had decided upon what would seem to be a reasonable schedule of maximum tolls higher than the existing schedule, and, applying that schedule to the predicted tonnage through the canal, found the revenue to be in 1919, $1,100,000; in 1929, $2,100,000; in 1933, $2,500,000; in 1943-44, $3,600,000. He was then asked:

"Q. May I ask whether these figures include any consideration of special factors of growth, like the increase of traffic, passenger traffic, by passenger steamers from New York to Boston, which cannot go around the Cape, and the transportation of coal in box barges, which is limited, as I understand, or as has been testified, to the use of the canal? A. All of the factors affecting the probable growth of traffic were considered by me in reaching a general decision as to the probable rate of increase. In connection with reaching that decision, the facts to which you refer, and certain others, were given weight."

After giving the future gross tonnage of the canal as above stated, the witness said that those figures "were merely a matter of computation," and on cross-examination he testified:

"A. My prediction as to the future development of the traffic of the canal was a judgment based not upon the development of the Cape Cod Canal to date. My judgment was influenced by that, but it was not based upon that development. X-Q. 21. And you based your opinion of the prospective

probable business of the canal 5, 10, 20, 30 years in the future on the calculations that you have given to the jury this morning? A. Certainly."

It is asserted on the part of the government that Professor Johnson predicated his opinion as to the future tonnage passing through the canal solely on facts relating to the Kiel, Suez and Manchester Canals, as to which the court had ruled that testimony could not be received. While the majority of the court are of the opinion that the record discloses that the witness, in giving the figures as to the future tonnage of the canal, stated a mere calculation, which any one could make if given the data, and not his opinion, and that the calculation was based mainly on the rate of increase of the three foreign canals, which rate was not allowed to be put in evidence, we do not, under the circumstances of this case, regard this question as of controlling importance, as it is involved in the broader question of whether the subject-matter with reference to which the witness was allowed to give his opinion was a proper subject for expert testimony.

Whether a given subject is one concerning which an expert may express an opinion is a question of law (Jones v. Tucker, 41 N. H.. 546, 549; Dole v. Johnson, 50 N. H. 452, 458; Keefe v. Railroad, 75 N. H. 116, 121, 71 Atl. 379); and it has been held that—

"When it is supposable that jurors can form a correct judgment or opinion, without the aid of the opinions of others, from facts stated, the opinions of others are not, as a general rule, to be received in evidence." Leighton v. Sargent, 31 N. H. 119, 133 (64 Am. Dec. 323); Keefe v. Railroad, supra.

Tested by this rule, was the opinion of Professor Johnson as to the probable future tonnage of the canal and the additional revenue to be derived in view of such increased tonnage a proper subject of opinion evidence? We think it was not. It seems to us that the jury might well be supposed to be able to determine the future increased tonnage of the canal from a statement of the facts upon which the witness might found his own opinion. In this case it could be shown what the tonnage passing through the canal was at the time of the taking, and the increase in the tonnage that had taken place from the time the canal was opened to the time of taking. It could also be shown what the tonnage going around the Cape was at the time of taking, and what the increase was over a reasonable period antedating that time, and, from this and other competent evidence bearing on the question, we think the jury could form a correct judgment of the probable future increase of the tonnage through the canal without the opinion of an expert.

Then, again, the tolls which the Canal Company could charge on the interstate traffic passing through the canal were subject to governmental regulation and the opinion of Professor Johnson as to the probable future revenue based on an increase of tolls was in any aspect nothing more than a mere guess.

We are therefore of the opinion that the evidence under consideration given by Professor Johnson was incompetent and should not have been received.

The fifth assignment is that the court erred in admitting in evidence for the purpose of showing the value of the canal property the opinion of General Goethals on the ground that it was predicated upon the testimony of another witness in the case. General Goethals was called by the Canal Company and qualified as an expert on the construction and operation of canals. He was asked to state his opinion as to the value of the canal, giving due consideration to the different elements of value which had been submitted, and especially to the potential earning capacity of the canal as outlined by Professor Johnson. The testimony was admitted and the government excepted, on the ground that the opinion was predicated upon the acceptance of Professor Johnson's figures as to the potential earning capacity of the canal. On cross-examination the witness testified that he accepted Professor Johnson's estimates of the probable tonnage and the probable revenue, but, when inquired of as to whether or not he incorporated them in his opinion or used them as a basis for it, he said in substance that he considered the prospective earning capacity of the canal, but that he did not know of the prospective earning capacity, as stated by Professor Johnson, at the time he made up opinion; that he did not know of his figures until he had made up his mind. Under these circumstances we do not think that this assignment, limited as it is, presents any question for our consideration.

[4] The sixth assignment relates to reproduction cost and is comprised under three heads—(a), (b), and (c). In subdivision (a) the government complains that the court erred in admitting, for the purpose of showing the value of the canal property, evidence relative to the amount which it would cost to reproduce the property under the conditions and the enhanced prices of April 1, 1919; in subdivision (b) it complains that there was error in the admission of evidence for the same purpose, for the reason that there was "no sufficient evidence in the case that the reproduction of the canal property at present prices and under present conditions was a reasonable commercial proposition"; and in subdivision (c) that the court erred in refusing to instruct the jury (1) that the "Canal Company is not entitled to such a sum as would enable it to reproduce the canal at present prices or at any prices"; and (2) that it is only entitled "to that sum which will enable it to procure something else of equal pecuniary present value"; and (3) that "the jury should not consider as elements of value the estimates of McGovern and Goethals of the reproduction cost of the canal at present prices."

Patrick McGovern, a contractor who duly qualified as an expert on the cost of construction, testified that in his estimation it would cost to reproduce the canal in 1919, $27,980,729, and General Goethals, who likewise qualified as an expert, testified that in his opinion the cost of reproducing the canal in 1919 would be $25,832,245, if the work was done by the government by "force account," or $30,716,081.75 if done by a private contractor, and if by a private corporation obliged to finance the project by floating stocks and bonds about $40,000,000. Before this evidence was introduced, counsel for the government re-

quested the court not to admit the evidence unless it was supported by affirmative proof on the part of the Canal Company that the reproduction of the canal at present prices was a reasonable, commercial proposition; that in the absence of such evidence the court should take judicial cognizance of the enormous increase in the cost of work of this sort between the time when the canal was built and the cost April 1, 1919. In answer to this the court said:

"So the question before me is whether I can say as a matter of fact—and it is nothing but a question of fact—that in this case the circumstances are so peculiar that reproduction cost is of no significance. I am not prepared to do it."

An exception was saved to the ruling of the court permitting the introduction of the evidence.

It is in substance conceded that reproduction cost is competent evidence of market value, provided the prices existing at the time of reproduction are normal, making due allowance for the period of time necessary to reconstruct the property.

The evidence which the Canal Company offered shows that reproduction prices as of April 1, 1919, were, due to war conditions, about 100 per cent. above the actual cost of the canal; and the question is whether, under such circumstances, the court below should have declined to admit the evidence of reproduction cost, unless he was satisfied from evidence produced that a reasonable man would undertake to reproduce the canal at present prices as a commercial proposition, or whether the evidence should have been submitted to the jury, with instructions that they should not consider it on the question of market value, unless they were satisfied by a balance of probabilities that a reasonable man would undertake to reproduce the property at present prices, or whether the evidence should have been submitted to the jury, with the single instruction that they might consider it, and allow it such weight as they thought it was entitled to, disparaged, as it might be, by proof introduced by the government     See Colburn v. Groton, 66 N. H. 151, 28 Atl. 95, 22 L. R. A. 763; Jaques v. Chandler, 73 N. H. 376, 382, 62 Atl. 713.

While it is customary to admit evidence of reproduction cost as bearing upon the question of value, the rule seems to be subject to certain limitations. In the Minnesota Rate Cases, 230 U. S. 352, 452, 33 Sup. Ct. 729, 761 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), Mr. Justice Hughes, speaking on this subject, said:

"The cost of reproduction method is of service in ascertaining the present value of the plant, when it is reasonably applied and when the cost of reproducing the property may be ascertained with a proper degree of certainty. But it should not justify the acceptance of results which depend upon mere conjecture."

In that case the court thought, in view of the length of time which had elapsed since the railroad was built and the material development of property and changes in the community since that time, that to attempt to estimate what would be the actual cost of acquiring the right of way over which the railroad was located, on the assumption

that the railroad was not there, was to indulge in mere speculation, and that such a method of ascertaining present value under the conditions shown should not be made use of. The question then is, if we assume that the cost of reproducing the canal may be ascertained with a proper degree of certainty, can the rule permitting the introduction of such evidence be reasonably applied in times of abnormal prices, in the absence of proof that a reasonably prudent man would purchase the property or undertake its construction at reproduction prices?

It seems to us that this is a necessary limitation upon the application or use of the rule when construction prices are abnormal, and that the court below either should have passed upon the preliminary question of fact himself, or submitted it to the jury, with instructions that they should not consider the evidence of reconstruction cost upon the question of value, unless they were satisfied that a reasonably prudent man would purchase or undertake the construction of the property at such a figure. When the cost of reproduction is taken into consideration as evidence of value, if the original property has depreciated, proper deduction therefor should be made in the evidence submitted to the jury.

As the evidence of Mr. McGovern and General Goethals was admitted generally and without limitation and without any deduction for depreciation, the court erred in so doing.

We do not find it necessary to consider in detail the requests for instructions embraced in this assignment of error, as they are, in all essential respects, covered by what has been said.

The seventh assignment of error is under three heads—(a), (b), and (c). In subdivision (a) the government complains that the court erred in admitting, for the purpose of showing the value of the canal property, the testimony of Admiral Francis T. Bowles and that of General Clarence R. Edwards relative to the utility and adaptability of the canal property for military and naval purposes.

In subdivision (b) it complains that the court erred in refusing to give the following instruction:

"That the value of the property in question is represented by the amount of money which the company could probably secure for it at a fair cash sale at the present time to some person or corporation other than the government."

And in subdivision (c) it complains that the court erred in admitting, for the purpose of showing the value of the canal property, the testimony of General Edwards that in his opinion the canal is a substantial and essential part of a modern scheme of defense of the United States in time of war.

Admiral Bowles was called by the Canal Company and qualified as an expert. He was asked, among other things, with regard to the use of the canal in connection with the military defense of the country in case of war. Counsel for the government objected that the company was not entitled to have the canal appraised at its value to the government for military or naval purposes. The court ruled that the avail-

ability of the canal for national defense was competent, and that the evidence might be admitted, and the government excepted.

Admiral Bowles then testified as to the availability of the canal for use for military and naval purposes. The court subsequently, in explaining his ruling, stated that he did not think he allowed the evidence as to the availability of the property for military and naval use "as to the dollars and cents value of that particular use."

General Edwards was called and qualified as an expert. Having testified that he had given consideration and study to the defense of the New England coast and submitted a report thereon to the War Department, he was asked whether the canal played any part in the plan of defense which he had outlined as commander of this department, and answered "Yes." He was then asked what was the importance the canal would play in his plan of defense. The court ruled that the question might be answered, the government saved an exception, and the witness answered: "I think, it is substantial and essential."

Counsel for the Canal Company, in the course of his argument to the jury, after referring to the testimony showing that the cost of reproducing the canal was from $25,000,000 to $30,000,000, said:

"So that we have here testimony upon which you would find that the least figure at which it could be reproduced by the government itself—and that is the important figure here for the reason I will point out in a moment—is in excess of $25,000,000. * * *

"Now, let us examine whether it would be likely to be built or not. You know something about what it costs for our national defense. I haven't the figures, but they are talking, I think you very likely saw recently, about $60,-000,000 for a new kind of dreadnaught, one dreadnaught. $25,000,000 would be less probably, than the cost of a cruiser for our national defense. Now, would they be likely to build it, even at a cost like this? New York has spent $168,000,000 for its system of canals, to build up its commerce. They are talking about $40,000,000 or $50,000,000 for a canal to build up commerce down across the state of New Jersey. Would they overlook us here in Massachusetts entirely with this small sum and this important arm of their canals if it had not been built?

"Well, now, let us see about it. How will we get at that? That question is how important is it to our national defense and the defense of the New England coast? If it was important and vital, do you suppose the government would neglect building it? Haven't we received some lessons in the last few years about national defense? Some of our generals have come home wide awake to them, and the slothfulness which has characterized our government in those matters is not to continue. National defense, the protection of national life, has a vitality now that it has not had in years before.

"Is this of any importance in national defense? Well, Captain Colbath, the witness for the government, says, it played an important part in winning the war—he says that. Admiral Bowles—you heard his testimony with regard to it—calm, quiet, impressive, characteristic of a man who has carried the responsibilities that he has carried for his country; as a young man the leading naval constructor in this country, deservedly winning the high title of rear admiral; then taken from official duty, put at the head of the Fore River Works, which were destined to become the great national building place for warships for the national defense; for several years he headed that great enterprise, and then from his retirement, when war broke out, he was called to one of the most stupendous tasks of the many stupendous tasks which were assigned to citizens in Washington in national defense. He had the practical supervision of the rebuilding of the American merchant marine. For the

Shipping Board he superintended, with supervisory powers, not only the great Hog Island yard, the most marvelous achievement in American history and in shipbuilding, but the shipyards throughout the country, which in the course of the war expended in the vicinity of $4,000,000,000.

"That is the man who told you, in those simple words, with regard to the vital part that this canal, even in its present condition, would play in the defense of the New England coast, joining together those great commercial centers of Boston and New York. And how is his testimony treated? With flippancy, as if it were a joke, as if somehow that testimony could be waived out of this case with a laugh and a sneer. He brought Colonel Shunk, I think, to contradict it, and, he becoming ill, he summoned General Burr, or at least he arranged in Washington that General Burr should be ordered on here to do it, with what results you know. General Goethals, of whom I shall speak a little later in another connection, confirmed everything from the military point of view that Admiral Bowles had said from the naval point of view. He said that it was a vital—I am not quoting exactly—an essential part of our coast defense. Narragansett Bay is likely to be the center of the navy for protection in action.

"But finding that at least in one particular the distinguished government counsel was going to produce a witness who would contradict somebody, we called, as we should have earlier, and it was a matter of delay, a gentleman recently back from the battlefields, with a proud and creditable record, bringing the lessons of that great contest, who has been placed in charge of the Northeastern Division, in charge of the defense of our New England coast. And what does he say? He says it is essential and necessary. Am I right? Essential and necessary—that is right—to our modern scheme of New England defense. And the distinguished counsel says that what is essential and necessary, by the highest military and naval authorities in this nation, would not be built because it costs twenty-five millions of dollars. 'We will build dreadnaughts that can be sunk in half an hour, we will build cruisers, and we will build forts that can be blown into eternity; but we won't have a canal—no, sir. I, Nathan Matthews, say it. No, sir.'

"He doesn't bring anybody to support it, not the slightest evidence; he doesn't bring a man to say that it is not useful; he doesn't bring one witness to say that it would not be built at $25,000,000—not one. And he has the resources of the United States Treasury behind him to summon witnesses wherever he will; and he prefers, instead of having some witness come here to say, 'At that figure it never would be built'—he prefers to assert it himself before you. Wasn't it enough to be counsel, without trying to be the witness, too, and furnish the evidence?

"It is for you to say, gentlemen. Is it likely that our government would be so neglectful of the interests committed to their charge that an essential and necessary part of a scheme of modern defense would not be built because it cost $25,000,000? Well, I think that if some administration said that it would not other administrations might be found that would say it would, and that might be a vital thing in turning out one administration and putting in another. Whether we are going to have national defense or not might easily become a question of importance. If it is, if it has that special value—and now I am speaking of special value—if it has really a special value because it is a vital factor in New England defense even in its present shape, and if it was not there the government would have to build it, is there any reason why they should not pay what it would cost them to build it so far? They say, 'We want it wider, we want it deeper.' All right. Take it; widen it and deepen it. It is big enough for us, it is big enough for our investment, as Mr. Wilson said; we cannot widen it and deepen it; it would not be commercially practicable at present, however it might in the future. They say currents run through it. All right. Stop the currents, if it is needed for national defense. It won't bankrupt this nation, after what it has gone through. But so far as it would cost you to do the work that we have done, why should you come in and take advantage of it, and take it away from us, and then say: Well, it will cost us $25,000,000 or more to build it; but as long as you have built it I

guess we will take it and pay you what we think it is worth; not what its benefit is to us a special value.

"Well, that may be fair. But isn't it a fact that the gentlemen who have had to deal with this for some reason or other have not gotten the right idea or right theory with regard to it; that they have been moved by obstinate opinion rather than a liberal view? Perhaps they have been too busy with other more important facts, and have not been able to give this attention; but you have devoted more than a month to it, and I rejoice that you will be able to give it the attention that it deserves.

"They say it must be fortified. But that does not make it any less valuable. We would not fortify it for commercial uses. General Edwards says it won't be fortified. It is perfectly easy—we have had the thing outlined what it means. If Provincetown should be fortified, if Cape Ann should be fortified, and in case of invasion the defense should be strung across that Bay, with mines there, so that no ships could enter, and if Nantucket or Martha's Vineyard in the same way were connected with Montauk Point, and that sound shut off, so that ships could not get into it, think what it means to have that canal joining Cape Cod Bay and Long Island Sound, all protected waters! It is perfectly evident what an essential and vital factor that water connection is, and I do not need to dwell upon it further."

In the course of his charge the court instructed the jury on this question as follows:

"This property, connecting as it does Cape Cod Bay and Buzzards Bay, obviously has some place in military and naval schemes of defense on the part of the United States. Nobody denies that. The history of the enterprise, with George Washington moving up Monument river and discussing it, as was testified to, we have no reason to believe falsely, testifies that. There is a good deal of discussion as to how much the military or naval value of the canal is. Of course, the only person interested in that is the government, which has the duty of national defense. How far are you going to consider this aspect of the canal in determining its value? Well, you are not to consider the necessities of the government. You are not to consider how much could be squeezed out of the government if the owner of the canal were at liberty to refuse to sell unless he got his price. You see at once that any such test as that would be absurd, because the man who happened to own Fisher's Island here, which is absolutely necessary, you see, to the defense of Long Island Sound, could ask his own price for it, and the government would have to pay it, because it has got to have fortifications there on Fisher's Island. That is not to be considered at all the necessities of the government for the property. But what you are to consider is this: If that canal is valuable for government use, the government has got to pay for the use—pay for it in peace, pay for it in war, pay for it when and as it uses it; and for that use, the government's use, and the compensation which would result from it, in addition to the commercial and pleasure use of the canal, you are entitled to give consideration in arriving at value."

After finishing his charge, at the request of counsel, the court further instructed the jury as follows:

"I state to you now, gentlemen, that the peculiar value of the property to the government for military, naval, or other uses is not to be considered as an element of value. I have already told you that the use which the government made of the property for tolls is to be considered."

The questions raised by the government's exception to the evidence are: (1) Whether the evidence as to the availability of the canal to the government for military or naval purposes was competent upon the issue of the market value of the property; and (2) if not, whether its use in argument by counsel for the Canal Company for the pur-

pose of showing the value of the canal to the government for military and naval purposes can be said to have been so eliminated from the minds of the jury by the instructions given that this court can see affirmatively that the error in the admission of the testimony worked no injury to the government.

[5] We are of the opinion that, in ascertaining the market value of property taken in a condemnation proceeding the utility or availability of the property for the special purpose of the taker cannot be shown, if the taker is the only party who can use the property for that purpose. If, however, the property has a special utility or availability, not only to the taker, but to other parties who could use the property for the particular purpose intended by the taker, then this utility or availability may be shown. Moulton v. Newburyport Water Co., 137 Mass. 163; Sargent v. Merrimac, 196 Mass. 171, 81 N. E. 970, 11 L. R. A. (N. S.) 996, 124 Am. St. Rep. 528; Mass. General Hospital v. Belmont, 233 Mass. 190, 124 N. E. 21; Matter of Daly v. Smith, 18 App. Div. 194, 45 N. Y. Supp. 785; Matter of Simmons, 130 App. Div. 350, 114 N. Y. Supp. 571; Id., 130 App. Div. 356, 114 N. Y. Supp. 575; Id., 195 N. Y. 573, 88 N. E. 1132; McGovern v. New York, 229 U. S. 363, 33 Sup. Ct. 876, 57 L. Ed. 1228, 46 L. R. A. (N. S.) 391; Boom Co. v. Patterson, 98 U. S. 403, 25 L. Ed. 206; United States v. Chandler-Dunbar Water Power Co., 229 U. S. 53, 33 Sup. Ct. 667, 57 L. Ed. 1063; New York v. Sage, 239 U. S. 57, 36 Sup. Ct. 25, 60 L. Ed. 143; Sidney v. N. E. R. R. Co. [1914] 3 K. B. 629.

The canal property, as a toll-producing instrumentality, is or may be of value to any person as owner. But the government upon whom the duty of national defense devolves is the only party to whom it has special utility for military and naval purposes. The evidence in question under this assignment had no relation to the toll-producing qualities of the canal, and had nothing to do in the way of showing its utility or availability for military or naval purposes in the hands of any person other than the government. Its sole bearing was upon the special and peculiar utility of the property to the government as a taker for purposes of national defense. The evidence was incompetent. Were the rights of the government prejudiced by its introduction and the trial rendered unfair?

[6] Although, after the completion of the charge, the jury were told that the peculiar value of the property to the government for military and naval uses was not to be considered as an element of value, the evidence bearing upon the question was not withdrawn, the argument of counsel based upon it was allowed to stand, and the jury were not told to eliminate from their minds either the evidence or the argument based upon it. The evidence of the utility of the canal to the government having been permitted to go to the jury, and argued in the forceful manner shown in the extracts above quoted, we are forced to the conclusion that the course pursued was prejudicial to the rights of the government and the trial was for this reason rendered unfair. Gilmer v. Higley, 110 U. S. 47, 50, 3 Sup. Ct.

471, 28 L. Ed. 62; Vicksburg & Merriden Railroad v. O'Brien, 119 U. S. 99, 103, 7 Sup. Ct. 118, 30 L. Ed. 299; Washington Gas Light Co. v. Landsden, 172 U. S. 534, 554, 19 Sup. Ct. 296, 43 L. Ed. 543; Throckmorton v. Holt, 180 U. S. 552, 557, 21 Sup. Ct. 474, 45 L. Ed. 663; Turner v. American Trust Co., 213 U. S. 257, 267, 29 Sup. Ct. 420, 53 L. Ed. 788.

The eighth assignment of error is divided into two subdivisions— (a) and (b). In subdivision (a) the complaint is that the court erred in admitting, for the purpose of showing the value of the canal property, the testimony of John J. Coakley, treasurer of the Canal Company, to the effect that the Canal Company had expended in addition to the direct cost of the canal certain amounts paid in stocks and bonds of the Canal Company for rights, franchises and services; that it had expended certain additional amounts by way of discount on its bonds, which it sold to provide funds for the construction of the canal; that in the course of its operations it distributed certain stock as bonus stock; that it paid the firm of August Belmont & Co. for organization expenses and for fiscal expenses, and for services, certain other sums; that it paid certain amounts by way of interest on its bonds and notes in excess of a reasonable allowance for interest during construction; and that it sustained throughout the period of operation operating losses. The evidence was admitted for the purpose of showing the original cost of the canal.

In subdivision (b) the complaint is that the court erred in refusing to give the jury the following instructions:

"(17) * * * In fixing the present value of the canal the jury are not to consider the amount which the Canal Company are out of pocket. They may, however, consider as evidence of present value the original cost of the present tangible property of the Canal Company described in the petition, in so far as that cost was fair and reasonable."

"(21) * * * The jury should not consider as evidence of value—

"(i) The loss to the company in interest paid on its bonds and notes in excess of a reasonable allowance for interest during construction; such allowance to be considered only in connection with the actual cost of the property.

"(j) Interest paid for any other or subsequent purposes."

"23. The jury are not to include in actual cost of the property the operating losses sustained by the company."

Although there is some dispute as to whether the government saved an exception to the evidence complained of under this assignment of error, we think that the record as a whole shows that an exception was saved to its introduction; and it is clear, so far as these matters are covered by the above requests for instructions, which were refused, that exceptions were duly saved, and that an exception was also saved to the instructions of the court to the jury relating to the particular items complained of in the evidence. Furthermore, as the case must for reasons previously stated be sent back for a new trial, we feel called upon to consider the questions raised by this assignment.

On the question of the actual cost of the property to the Canal Company it introduced its evidence under four heads:

(271 F.)

(1) Direct costs, the various items of which amounted to......$6,245,256.97
(2) Overhead costs, the items of which amounted to............ 1,287,598.70
 Interest on same during construction...................... 972,027.72

  Total ..........................................$8,504,883.39
(3) Development costs:
 (a) Net operating loss, July 30, 1914, to March 31, 1919,
  when the government took over the property for war
  purposes ........................................$ 243,961.77
 (b) Interest on $6,000,000 of its outstanding bonds........ 1,628,416.77
 (c) Discount on $2,000,000 of notes issued to fund indebted-
  ness ............................................ 423,925.74

  Total development costs....................$2,296,304.28
(4) Additional items:
 Loss of interest on paid-in cash capital of Construction
  Company, nine years at 6 per cent.................... $540,000.00
 Income tax payment ................................ 18,479.58
 Contingent claims (obligations incurred through negli-
  gence in sinking a ship in the canal)................ 300,000.00

  Total of additional items........................ $858,479.58
These totals make the sum of.............................$11,659,667.25
 There were also included in the cost of the property:
(1) Payments in stock and bonds for rights, franchise and serv-
  ices (at par value of securities)........................ 2,050,000.00
(2) Discounts from par value of stocks and bonds sold to syn-
  dicate ............................................ 1,006,250.00

  Total ..........................................$14,715,917.25

The court, in charging the jury as to the costs of the work, said:

"The counsel have saved us a great deal of time and effort by the way in which they have dealt with that question. They submitted, you remember, a very condensed, summarized result made by accountants from the books of the Canal Company, and which represented, I have no doubt, weeks of work. The parties are, as to some of the figures, not greatly apart; as to the actual figures not at all. They took those from the books of the company. The government accountants thought that the direct cost, as they termed it, was about eight and a quarter millions. Taking their basis of figuring, the Canal Company arrived at a result within a couple of hundred thousand dollars of that, about $8,400,000. But the Canal Company says that those figures were not correct, in that they did not include certain elements which were fairly includable in the cost, for instance, development expense and things of that sort; and the Canal Company says that the out of pocket cost of the thing was somewhere about eleven and a half millions, if I carry their figures right—that being the cash out of pocket cost of the enterprise up to the time when you are to make your valuation. In addition to which the Canal Company stated that it had cost something like three millions more in securities, as to the dollars and cents worth of which there may be very fair room for argument and doubt.

"The cost, you see, depends largely on what items you include in the cost. The government says that the eight and a quarter millions included items of overhead and office and promotion expenses, which ought to have been left out, which were not part of the cost. Well, that is a question for you to say, always remembering that, when we are working toward the cost, we are not working towards the verdict but are only working towards one of the facts which we desire to have in mind in reaching a verdict and in forming a judgment. And so you will consider the evidence as to cost from the various angles, and see about what you think should be fairly considered as the cost of the structure or construction as it now exists. And you should consider, also, the cost of the franchise. A franchise is the act of the Legislature and the rights which it confers, and we all know that in an enterprise of this sort

that involves a real expense. Nobody could do that sort of thing and get that franchise without a substantial expenditure, and the franchise itself once. you have it is in the nature of a monopoly from the character of the land. There appears to be only this one place in which a canal can be built there, and it may have a value above the cost of getting it. Probably it does have a value above the cost of getting it, or at least was supposed to or nobody would have put the expense into it.

"And so, taking all those elements, you will arrive at what you think is the out of pocket cost of the franchise and the works and appurtenances."

To this instruction the government excepted.

It is apparent from this charge that the court regarded the evidence as showing what he termed "cash out of pocket cost of the enterprise," to be about eleven and a half millions, which necessarily included the items of "direct costs," of "development costs" and the so-called "additional items"; that he considered the "three millions or more in securities" as covering the items "payments in stocks and bonds" and "discounts on stocks and bonds," which, as above shown, amount to a little rising $3,000,000, and that under the instructions given the jury were to take all of these items into account in arriving at the cost of the canal.

The court further charged the jury as follows:

"Something was said to you about including damage claims in this development cost. I do not think they should be, and I tell you they are not. I see no reason why a pilot's blunder in running a ship ashore, although it may have been a thing that was to be expected, should be considered as development cost or as any other kind of cost to the canal."

He also later told the jury that they were not to consider as evidence of value "the amount of stock and bonds issued by the company, nor the amount of the mortgage, nor the amount of money borrowed on mortgage, on notes, or represented by the floating debt, nor the loss to the company by reason of discounts on the sale or pledge of its bonds."

Whether the jury were to understand from this charge that they were not to take into consideration the discount on the $2,000,000 of notes issued to fund indebtedness amounting to $423,925.74, or were not to take into consideration the discounts on the par value of the stocks that went in to make up a part of the $1,006,250, it is difficult to determine. They were only told that they were not to take into account "the discounts on the sale or pledge of its bonds."

[7] In ascertaining the fair value of a public utility, apart from its franchise, consideration has to be given to the value of its physical property, including preliminary and overhead costs necessary to prepare the plant for service, and also to those costs incurred in creating the business and revenue of the enterprise, or what is generally known as "going value" of the concern, provided the business has become profitable, or there is a reasonable probability of its becoming so.

In ascertaining the "going value" of such a utility, consideration may properly be given to the sums actually and fairly expended in producing the business, the same as the fair value of the physical property may be arrived at from a consideration of its original cost. It is

said that, in the case of a public utility, "going value" is not good will, and this may be true where the utility has a monopoly of the business in the community which it serves. Whether it is true as applied to this canal, which has to compete for business with the natural route for ships around the Cape, may be doubtful. But whether it be called going value or good will, we think the elements of cost that enter into it may properly be considered as elements going to increase the physical value of the plant. Kennebec Water District v. Waterville, 97 Me. 185, 217, 54 Atl. 6, 60 L. R. A. 856; Brunswick & T. Water Dist. v. Maine Water Co., 99 Me. 371, 59 Atl. 537; Gloucester Water Supply Co. v. Gloucester, 179 Mass. 365, 382, 60 N. E. 977; Omaha v. Omaha Water Co., 218 U. S. 180, 202, 30 Sup. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Spring Valley Water Works v. San Francisco (C. C.) 192 Fed. 137; Des Moines Water Co. v. Des Moines (C. C.) 192 Fed. 193; People v. Willcox, 210 N. Y. 479, 104 N. E. 911, 51 L. R. A. (N. S.) 1. See, also, Brooklyn Borough Gas Co. v. Public Service Commission, P. U. R. 1918F, 335, 354, and cases there cited.

In the trial of this case these costs were spoken of as "development costs," and it is argued that to allow such costs is to capitalize losses, and that on this theory the greater the loss the greater would be the value, and that no limit could be placed on the period of development in creating a "going value." But we think that such costs may fairly be taken into consideration in determining the amount by which the value of the physical plant should be increased, provided the evidence discloses that the enterprise is a profitable one, or that there is reasonable probability that it will become so. A business which is unprofitable, or which it is not reasonably probable will become profitable within a reasonable time, has no "going value." It may be difficult to determine how much of the costs of development should be allowed as having created a "going value," but the question does not stand differently from other questions of fact which must be determined by a jury.

As to the competency of the items of cost introduced under the heading "Development Costs," we think that the item termed "Net operating loss" was proper to be considered, if it was made to appear that the enterprise, at the time of the taking, was a profitable one, or that it was reasonably probable it would become profitable within a reasonable time. The item of "Interest on bonds" under this heading, we do not regard as proper evidence of going value; but interest on money derived from the bonds, to the extent that the money went into the development of the business, and not into construction, would be proper to be considered, subject to the limitation above stated. In considering such items, however, the jury should be instructed that they should not be taken into account by them if they are of the opinion that the enterprise had, at the time of the taking, no going value, actual or potential, as above defined.

The items of discount on "notes issued to fund indebtedness" and "discount from the par value of stocks and bonds sold to syndicate" we do not regard as proper, either as items of actual cost or as bearing on going value. These items are not a part of the actual cost, and

271 F.—57

in no way contributed to the going value of the enterprise, if it had any.

[8] Upon the question of the actual cost of the construction of the property, we think that the item designated "Payment in stocks and bonds for franchise, etc.," at par value of the securities, amounting to $2,050,000, was improperly received. These stocks and bonds were a part of the $12,000,000, or thereabout, of stocks and bonds turned over by the Canal Company to the Construction Company for building the canal; and of the $2,050,000 stocks and bonds, $1,650,000 were paid by the Construction Company to Mr. Flannigan for the franchise and right of way, $100,000 was paid to Parsons, in addition to the cash paid him, for services as engineer, $250,000 to McDonald for services as president and general manager of the Construction Company, and $50,000 to August Belmont for organizing a syndicate to float the bonds for the Construction Company. If some of the stocks and bonds going to make up the $2,050,000 can be fairly said to have gone into the construction cost of the canal, there is no evidence of their value upon which to base the cost of construction that they went to satisfy. The payment to Belmont for organizing the syndicate to float the bonds is, in no sense, a proper element of cost, and the evidence would indicate that the par value of the securities paid to McDonald was far in excess of the value of the services rendered by him.

The federal income tax of $18,479.58 was not a tax upon the income of the Canal Company, for it had no net income. It was a tax upon the income of the Construction Company based on the par value of the bonds paid it by the Canal Company, and could not properly be considered as an item of cost entering into the construction of the canal.

The item of $208,225.28, given under the head of "Organization and Promotion," includes $50,000 paid to Belmont & Co. for organizing a syndicate to float the Canal Company's stocks and bonds. We do not think this item should be included as a part of the cost of construction. As to whether the other items embraced in the sum, of $208,225.28 are proper items of construction costs the record is obscure. So far as this sum may have included engineering expenses, plans, and legal services rendered in connection with or in relation to land taking, railroad changes, or work pertaining to canal construction, as distinguished from underwriting and financing services, such expenses may be properly considered.

The item of $325,000 designated "Fiscal," represents $50,000 a year for 6½ years paid for services in financing the company. We do not think this item should be included as an item of construction cost.

There is also an item of $122,960.28 for legal expenses and an item of $10,450.55 for miscellaneous expenses. Whether the legal services for which this was paid had to do with work pertaining to the construction of the canal the evidence does not disclose, and neither that nor the item for miscellaneous expenses should be included in the cost

unless and only to the extent that they pertained to the construction of the canal.

An item of $260,462.76, designated as "Administration," was allowed to go to the jury as construction cost. The evidence shows that this included the cost of the premium on the bond of the Construction Company and the cost of the general administration offices in New York outside of fiscal agents. We think that the premium on the bond is a proper element of cost, and that the general administration expenses of the New York offices, outside of fiscal agents, may be, provided they were incurred and had to do with furthering the construction of the canal. The evidence, however, is silent on this question.

It appeared that the Construction Company which built the canal had a capital of $1,000,000, and that interest on this sum for 9 years at 6 per cent. amounted to $540,000. This item was included as an element of construction cost. It also appeared that interest during construction, which covered the period from 1910 to April, 1916, amounting to $972,027.72, was introduced as a part of the cost of construction under the heading "Overhead Costs." It is evident that the interest on the $1,000,000 covered the 6 years of the construction period and 3 years of the development period. It is apparent, if the interest that accrued on the $1,000,000 during the construction period of 6 years was included in the item of $972,027.72, it should not have been received a second time in evidence. If not so included, we regard it as proper. But such of the interest as accrued during the 3 years after the canal was completed was erroneously received, as it could not have entered into the cost of construction.

The jury were not permitted to consider the item of contingent claims, amounting to $300,000, nor the discounts from the par value of the stocks and bonds sold to the syndicate of $1,006,250, as elements of construction cost, and we think rightly.

[9] The ninth assignment of error relates to the form and substance of the judgment. The questions under this assignment arise out of the Canal Company's petition for entry of judgment, and the motion of the government to dismiss that petition. We think the motion should have been granted, and the judgment framed without reference to the petition. The petition for judgment was grounded upon a theory entirely inconsistent with the petition for condemnation, with the answer of the Canal Company asserting sole ownership in the canal property, and with the verdict of the jury finding that it was the sole owner; and the court should have entered a conditional judgment, such as is customary and called for by the statutes under which the condemnation proceeding was brought, and complying with the pleadings and verdict of the jury.

The judgment of the District Court is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.