### SOUTHERN SCRAP MATERIAL CO., Limited v. UNITED STATES.

No. 46443.

United States Court of Claims.

March 7, 1949.

---

Eldon S. Lazarus, of New Orleans, La., for plaintiff.

William A. Stern II, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and MADDEN, HOWELL, WHITAKER and LITTLETON, Judges.

MADDEN, Judge.

The plaintiff, a corporation located in New Orleans, sues for just compensation for the taking by the Government of its buildings. The buildings stood on land of the Southern Pacific Railway Company at its docks in Galveston, Texas. They were constructed with steel frames, corrugated iron roofs and sides, and metal sash, and were so constructed that the interiors of the three buildings formed a single open space. They had been built in 1913 and 1914, and had been leased to a succession of enterprises for warehouse or factory purposes. On September 3, 1942, the buildings not having been used for several years, the purchasing agent· for the railroad sent mimeographed invitations to fifteen concerns, one of which was the plaintiff, asking for bids for the purchase and removal of the buildings. The invitees were persons or companies known to the railroad to be in the business of buying and selling scrap and used materials.

The plaintiff bid $40,175. Three other invitees, one located in Houston, Texas, and two in Chicago, Illinois, submitted bids. The plaintiff was the highest bidder, and the buildings were sold to it on October 8, 1942, at its bid price. The bill of sale provided for the removal of the buildings from the land of the railroad not later than January 31, 1943. On December 29, 1942, the Government, through the War Production Board, requisitioned the buildings for the purpose of dismantling them and using the structural steel which would be obtained from them to construct a defense plant in California. The buildings were so dismantled, and the steel was loaded on railway cars and shipped to California where most of it was used as contemplated. The corrugated iron roofing and siding, and most, if not all of the metal sash, was sold as metal scrap at the site of the dismantling.

The notice of the requisition, and directions for filing its claim for compensation, were served on the plaintiff on January 14, 1943. The plaintiff did not file its claim until January 1944. The War Production Board made its preliminary determination that $50,000 was just compensation, on May 18, 1944, and its final award of that amount on October 24, 1944. The plaintiff declined to accept the award as full payment, but accepted one-half of the award, reserving its right to sue the Government for what it might claim to be just compensation.

A large volume of evidence has been presented, relating to the condition of the steel in the buildings, the price of new structural steel and the cost of its fabrication into members of various sizes, and of its erection into buildings; the cost of dismantling, sandblasting, repairing and painting the particular steel in question here, and used steel in general; the proper rate of depreciation to be applied to steel standing in a building; and other matters which might have a bearing on the fair value of this steel. The evidence of the plaintiff and the Government on these points is at great variance.

The basic idea of just compensation is that the Government, in taking property which it needs for a public purpose, should pay the owner the amount which he could have obtained for it by selling it privately. If, therefore, there is shown to be a market and a market value for the property, resort need not and ought not to be had to theoretical computations, such as are embodied in much of the evidence in this case.

The plaintiff says that it has shown a market value for the steel in question, by showing the price at which five steel structures were sold in Louisiana and Mississippi in the years 1941 and 1942. Those build-

ings were sold for lump sums but if the price per ton of steel which those lump sums would represent is computed, it tends to support the plaintiff's claim for a larger amount than the Government awarded it. Two of the five buildings were sold and re-sold within short periods, the resale being at approximately twice the price of the first sale. The plaintiff says that the first sale should not be considered as evidence of market value, since it was to a dealer, and not to a consumer. The plaintiff also urges that the sale of the buildings whose value is here in question by the railroad to the plaintiff is not evidence of market value, since it bought as a dealer and not as a consumer. The Government says that the sales of the five buildings shown by the plaintiff's evidence should not be taken as showing market value because the steel in those buildings consisted of lighter units, and its price per ton was greater because of the greater cost of fabrication.

Our impression of the evidence of the sales of the five buildings offered by the plaintiff is that it is not very helpful, and is certainly not the best evidence of market value available in this case. The sale of five relatively small and lighter buildings, in a large area, during a period of two years, and at per ton prices varying greatly from one building to another, and from one sale to another of the same building, does not show any uniformity of price, resembling a market. It shows rather that the sale of a building for dismantling and re-erection is a rare and occasional transaction, which occurs only when a buyer happens to turn up who needs the steel and is willing to get it by that difficult process. That coincidence of a willing buyer and a willing seller would be much less likely to occur with a large building than with a small one.

We think that in this case there is unusually trustworthy evidence of what a willing buyer would give a willing seller for the kind of property here in question, at the time and place in question. As we have said, this very property was sold by the railroad to this plaintiff on October 8, 1942, for $40,175. The railroad had invited bids from firms local and national which it regarded as the best prospects for the purchase of the property. Eleven of the fifteen invitees made no offer at all for the buildings. That is evidence that there was no regular and dependable market for such unusual property at any price, even late in 1942 when steel was becoming difficult to obtain.

Four of the fifteen invitees submitted bids, the plaintiff's being the highest. We see no reason to think that the potential market was not fairly sampled by the railroad's solicitation of offers. We can think of no more trustworthy evidence of what a willing buyer would give for a certain piece of property than an actual solicitation of the potential buyers and their reaction to the solicitation, all of which occurred shortly before the Government's requisition of the property, and when the demand for such property was substantially the same as at the time of the requisition. This evidence indicates a value of $40,175 for the property. We have, however, with considerable hesitation, concluded to consider two other factors, which point to a higher valuation. The plaintiff, being a dealer, bought the property for resale at a profit, and its knowledge of the market must have indicated a probability that it could resell the property at a profit, or it would not have bought it. The Government's agents, after a deliberate study of the problem, concluded that a fair price for the property was $50,000. We conclude, therefore, that that sum constituted just compensation. The plaintiff is entitled to judgment for $25,000, plus an additional amount measured by interest at the rate of four percent per annum on $50,000 from December 29, 1942, the date of requisition, to October 24, 1944, the date of the award to it of $50,000.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.