**HICKEY et al. v. UNITED STATES.**

No. 10966.

United States Court of Appeals
Third Circuit.

Argued May 5, 1953.

Decided Oct. 14, 1953.

As Amended on Denial of Rehearing
Dec. 11, 1953.

Writ of Certiorari Denied
March 8, 1954.

See 74 S.Ct. 519.

S. Billingsley Hill, Washington, D. C.
(James M. McInerney, Asst. Atty. Gen.,
Gerald A. Gleeson, U. S. Atty., Phila-
delphia, Pa., C. James Todaro, Sp. Asst.
to Atty. Gen., Roger P. Marquis, Atty.,

Department of Justice, Washington, D. C., on the brief), for appellant.

J. Harry LaBrum, Philadelphia, Pa., Stanley Folz, James M. Marsh, Philadelphia, Pa. (Folz, Bard, Kamsler, Goodis & Greenfield, Conlen, LaBrum & Beechwood, Philadelphia, Pa., on the brief), for appellees.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

BIGGS, Chief Judge.

This is an appeal by the United States in a condemnation proceeding. On February 6, 1951, the United States condemned a lot and a building, the Penn Athletic Club at 18th and Locust Streets, facing Rittenhouse Square, in the central business district of Philadelphia. The United States deposited estimated just compensation in the amount of $1,250,000 in the Registry of the District Court for the Eastern District of Pennsylvania. The owners of the property, being dissatisfied with the estimated compensation, requested the appointment of a board of view. The board of view reported that $2,865,000 was the fair value of the property taken. The United States, in turn dissatisfied with this figure, demanded a jury trial. The trial, from which this appeal is taken, resulted in a verdict of $2,100,000 in favor of the condemnees.

The Penn Athletic Club is a fourteen story building, standing upon a lot measuring 195 feet by 175 feet. The building was erected in 1926 and the original cost was $1,250,000 for the land and approximately $7,000,000 for the building and its furnishings. It was built as an athletic club with the usual facilities for sports together with those ordinarily found in any large residential club. The Penn Athletic Club occupied the building from 1926 to 1942, when it could no longer afford to stay, and deeded the property to the trustee of its bondholders, Girard Trust Company. Girard leased the building (except the first floor stores) to the Securities and Exchange Commission for use as an office building from 1942 to February 7, 1948. Girard sold the property to the present condemnees on August 30, 1948, for $1,250,-000. The building was vacant from the time the Securities and Exchange Commission left until the condemnation proceedings in the instant case began on February 6, 1951.

At the trial condemnees offered four experienced real estate brokers to testify as experts to the value of the Penn Athletic Club. These witnesses testified that the property was worth $3,850,000, $3,-325,000, $3,250,000, and $3,150,000, respectively. Three experts testifying for the United States estimated the value of the property at $1,575,000, $1,550,000 and $1,500,000. The jury, as we have said, returned a verdict of $2,100,000.

The United States has set out six assignments of error as its grounds for seeking to reverse the judgment. These will be discussed in order.

(1) The United States contends that certain statements made by the trial judge during the trial were prejudicial to its case. It also claims that the trial court misstated the applicable law in the presence of the jury. These claimed errors do not go to the admissibility of evidence or any rulings upon the evidence by the trial judge, but refer only to statements made during the conduct of the trial.

For example, a sharp difference of opinion developed during the trial between the United States and the condemnees as to the weight to be given to the sale of the Penn Athletic Club by Girard to the condemnees in 1948. This controversy arose at the inception of the Government's case. The United States took and takes the position that the sale referred to was a very important factor in determining the compensation to be awarded by the jury. The condemnees, on the other hand, tried to minimize the importance of this sale and to emphasize other elements of value. George H. Brown, a witness for the United States, who was at the time of the sale a senior officer of Girard, testified in detail as to

the history of the property between 1942 and 1948, the period during which Girard as trustee was in possession. The trial judge intervened in this examination. The colloquy in the margin then took place.[1] The United States contends that the statement of law as given by its attorney during this colloquy was correct and that, consequently, the action of the trial judge in striking out the statement is error.

The point at issue is the relative weight to be given to the recent prior sale of the property condemned and to recent sales of other, comparable property. As between the two, it is the position of the United States that a prior sale of the precise property condemned was, as a matter of law, entitled to more weight than sales of comparable property.

As a statement of law, applicable to all condemnation cases, we cannot agree that the statement made by the Government's counsel, quoted in the fourth paragraph of note 1, supra, is correct. It is too broad. In some cases the principle insisted on may properly be applied. The precedents most favorable to the United States say no more than this.[2] But counsel made his statement as a flat rule of law universally applicable in condemnation cases and by inference in this condemnation case in particular.

We reject the conception that a prior sale or sales of condemned property must always, as a matter of law, be given more weight in condemnation proceedings than sales of comparable property. Recent sales of the very property condemned are entitled to considerable weight, but sales of similar property are entitled to weight also; and the relative importance of the two is dependent upon the facts in the particular condemnation proceeding.[3] While it is true that prior sales of the condemned property eliminate any question as to whether another sale was of a comparable piece of property, nevertheless the comparison of sales of other properties have their advantages too. For example, the sale of another property may be closer in time to the date of the taking, and therefore would reflect more accurately the condition of the market at the time of the taking. In the instant case sales of other properties which took place within a few months of February 6, 1951 were testified to. By comparison the prior sale of the Penn Athletic Club itself occurred almost three years before the condemnation was begun. The issue presented is peculiarly within the discretion of the trial judge in the light of the facts in each case. We hold that the trial court did not exceed the bounds of legal discretion here.[4] In view of the fact that the

1. "The Court: I don't want undue importance on this, the way it is being built up. I don't know why we couldn't have gone into some of these other sales, gone into the background, the same way. I don't like the emphasis being put on this one sale.

"Mr. Todaro: Your Honor, we take the view——

"The Court: You have the vice president of a bank and everybody else brought in here. Why don't we get it for every other sale? It would be just as competent for the others, to lay stress on any other ten.

"Mr. Todaro: The decisions are to the effect that while the other properties would be similar or comparable, here you have an identical property, so that there won't be any necessity for making any physical distinctions or comparisons. That is why the courts have laid greater emphasis on the sale of the same property.

"The Court: No, no.

"Mr. La Brum: I move that be stricken out. That is not correct.

"The Court: Yes.

"Mr. Todaro: Yes, it is.

"Mr. La Brum: It isn't correct.

"The Court: Strike it out."

2. Southern Scrap Material Co. v. United States, 1949, 113 Ct.Cl. 119, 82 F.Supp. 520; Baetjer v. United States, 1 Cir., 1943, 143 F.2d 391, 397; United States v. 13,255.53 Acres, 3 Cir., 1946, 158 F.2d 874, 876.

3. See Dickinson v. United States, 4 Cir., 1946, 154 F.2d 642; United States v. Becktold Co., 8 Cir., 1942, 129 F.2d 473, 479; and see cases cited in note 2 supra.

4. There is one case, however, where prior sales of the property condemned probably

trial court correctly ruled on the issue presented by the government's counsel, the fact that he did so in the presence of the jury can scarcely be viewed as prejudicial, at least on the basis of this single instance.

But the United States goes further and asserts in effect that it was prejudiced because the trial judge reiterated several times during the presentation of its case that it was placing too much emphasis on the 1948 sale of the condemned property.[5] As a matter of fact the comments of the trial judge indicating that in his opinion too much stress was being put by the Government on the 1948 sale were made at least half a dozen times. The reiteration of the comment may have made a somewhat substantial impression on the minds of the jury. On the other hand the references made to the 1948 sale by the court in its instructions to the jury gave considerable weight to that sale. The court stated in part as follows: "You know the details of that sale, because you have heard it. You have heard the circumstances under which it took place almost three years prior to February 6, 1951, and it is important that you consider it and determine what weight you will give to it, because the sale of an identical property in a time reasonably near the taking is a very desirable standard by which to conform a judgment, as I read the law."

▮▮▮ Although a district judge has considerable latitude in commenting upon the evidence, his statements have much influence on the jury. Consequently statements which the trial judge may make and which may fairly be said to be prejudicial will compel reversal. See Billeci v. United States, 1950, 87 U.S. App.D.C. 274, 184 F.2d 394, 402. And it has recently been held in a condemnation case that several prejudicial comments by the trial judge before a jury warranted a new trial. United States v. Ham, 8 Cir., 1951, 187 F.2d 265. But we cannot say that these statements of the trial judge in the instant case, in and of themselves, had the effect of precluding

---

are entitled to more weight than sales of other properties, as a matter of law. Where no "market" for the condemned property exists, sales of other property are entitled to little weight (or indeed no weight at all). See United States v. Toronto, Hamilton & Buffalo Navigation Co., 1949, 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195. In that case, Mr. Justice Clark stated: "At times, however, peculiar circumstances may make it impossible to determine a 'market value.' There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. We then say that there is 'no market' for the property in question. But that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property. * * * We simply must be wary that we give these sparse sales less weight than we accord 'market' price, and take into consideration those special circumstances in other sales which would not have affected our hypothetical buyer."

In the case at bar, however, a large number of sales of office buildings in the downtown area of Philadelphia were introduced into evidence and treated by both sides as sales of property comparable to the Penn Athletic Club. It therefore appears that these other sales were deemed to be in the same "market" as the Penn Athletic Club itself, in spite of the fact that the Penn Athletic Club was not itself built as an office building, and is referred to in the record as "not comparable" to any other property.

5. For example: "The Court: I think we are giving too much undue stress to one sale. I do not see why we should stress this sale unless you——

"Mr. Todaro: I can abbreviate it. I just thought Mr. Brown——

"The Court: Well, I know, but we are spending too much time on it.

＊　　＊　　＊　　＊　　＊

"Q. And what were the amounts they appraised the market value at?

"Mr. La Brum: I object, Your Honor.

"The Court: Objection sustained. I think we are giving entirely too much weight to one sale.

＊　　＊　　＊　　＊　　＊

"Mr. Todaro: I think we are coming to the essence of the matter now.

"The Court: You are unduly stressing it."

a fair and dispassionate consideration of the evidence by the jury. The issue of value was fairly put to the jury in the charge, as we have stated, and much of what the trial court said, to which the United States now objects, was evoked by what was, in our opinion, too great an emphasis sought to be placed on the 1948 sale by zealous counsel. On the other hand the trial judge by his remarks, during the course of the trial, did subject the 1948 sale to some disparagement. It would have been more correct for the trial court to have said less. At the new trial our suggestion in this regard should be borne in mind but we do not reverse the judgment and grant a new trial on this ground.

(2) Under its second assignment of error, the United States contends that the court below created the impression in the jury's mind that the 1948 sale of the condemned property was not truly representative of the market value of the property at the time of the sale. The United States asserts that the trial court indicated to the jury that the 1948 sale was a "forced" sale, and that therefore the property was sold for less than it should have brought. The precise complaint of the United States is confined to two instructions given to the jury. In these the court suggested several times that the jury should consider whether there was a "willing seller" in the 1948 sale. The United States' requested instruction to the effect that the 1948 sale was at arm's length and in the open market, was refused.

■■ The position asserted by the United States is that the repeated use of the words "willing seller" in the charge constituted a strong suggestion that the court itself believed that the 1948 sale of the condemned property was "forced". The phrase "forced sale" is used in the law of condemnation to describe a sale of property which is inadmissible as evidence of value because elements of compulsion so affected the seller that the sale could not be said to be fairly representa-

tive of market value at the time made. The conception of a forced or compulsive sale includes force or compulsion as a result of some kind of legal process. Thus sales on foreclosure or execution are treated as forced sales. Baetjer v. United States, 1 Cir., 1943, 143 F.2d 391, 397. But the compulsion may also be that created by business circumstances. For example, a property taken in discharge of a debt may be considered a forced sale, where the creditor had little choice in the matter. See Landquist v. City of Chicago, 1902, 200 Ill. 69, 65 N.E. 681. But compare Sargent Barge Line, Inc. v. Newtown Creek Towing Co., D.C. E.D.N.Y.1932 (The Welfare), 1 F.Supp. 585. A forced sale is one which has no probative value whatever and therefore must be excluded from evidence. In the instant case, evidence of the 1948 sale of the condemned property came into the record without objection.[6] Therefore it should not be argued that the trial court treated this sale as a "forced sale" within the meaning of that phrase as strictly defined by precedent.

The United States insists, however, that there were no circumstances attendant to the 1948 sale to justify the trial court suggesting to the jury that the sale was anything but a fair one, at the full market price; that therefore the condemnor's case was prejudiced by this conduct. The government properly points out that Girard held the Penn Athletic Club and had the property on the market from 1942 to 1948. During the war years, as a result of the lack of activity in the real estate market, the property was not sold. Beginning in 1946, however, buyers began to show considerable interest in the property. Brown, vice-president of Girard, testified that in 1946 the trustee was dealing with prospective purchasers "literally by the dozens." On account of the interest shown, Girard decided to request formal bids, setting an upset price of $1,750,000, in 1946. No bids at or above the designated price were received. When Girard

---

6. Objections are made for the first time in the appellees' brief in this court.

received an offer of $1,250,000 on behalf of the present owners, the condemnees, it found the offer sufficiently attractive to take it to the court which was exercising jurisdiction over the property at the time, for approval. Only after extensive advertising and requests for bids in excess of $1,250,000 did the court approve the sale to the present owners at that price. Girard was not faced with a deadline at any time to complete its sale to the present owners and indeed, the property was actively on the market for sale for two years preceding its transfer to the present owners.

■■ Nevertheless, the condemnees did and do point out some features of the 1948 sale which constituted some evidence at least that Girard was not entirely a free agent in completing the 1948 sale. Some bondholders desired the property to be sold; the property was vacant; a tax assessment was outstanding against the property; Girard was acting as trustee; and a quick sale of the property would eliminate Girard's continuing liability for real estate taxes. While we agree that these features do not amount to serious compulsion, it was nevertheless entirely within the trial court's discretion to point them out as part of his charge. The court did not state to the jury that these features amounted to compulsion and we cannot say that the phrase "willing seller" necessarily implies serious compulsion in view of the fact that this sale had been admitted into evidence. The trial court's charge on this point did not exceed the bounds of its discretion and we find no reversible error here.

(3) The United States in its next assignment of error asserts that the court below refused to permit it, in presenting its case-in-chief, to bring out the cost of alterations or repairs that would have been required in order to make the Penn Athletic Club useful for any of the uses proposed by the expert witnesses. Expert witnesses for the condemnees had testified that an office building or institution, to be occupied by one tenant, was the highest and best use to which the property could be put. For example, C. S. Thalheimer, an architect, testified in response to the question put to him on direct examination, "Now, Mr. Thalheimer, do you have a professional opinion as to the purposes to which this building could have been put as of February 6, 1951 [the day of taking]?", replied in the affirmative. He was then asked, "Will you please state what those uses are?" He replied: " * * * I would think that the first use to which the building could have been put was for single occupancy * * * a one-purpose tenant, an insurance company, or a bank * * * ". Thalheimer went on to say: "It could have been used for an office building that would have many tenants; it could have been used as a club building as it existed; it could have been used as a combination club building and hotel building; it could have been used or converted for an apartment building; it had many uses to which it could have been put." It is clear from the record that to obtain the highest and best use of the property, alterations, repairs and conversion were necessary. The court below, without objection from the condemnees, properly allowed cross-examination by the United States of two of condemnees' expert witnesses as to the sums necessary to be expended to obtain the best use of the building. When the United States attempted to cross-examine the fourth witness, Barnard, offered by the condemnees on the subject of the cost of necessary repairs, the condemnees objected on the ground that the United States was "putting figures in again", and the objection was sustained.

■ When the United States in its case-in-chief tried to offer testimony through its own expert witness on valuation, H. E. Haeberle, as to his judgment as to the amount that would be necessary to be expended on the building to make it habitable for club purposes, or for one-tenant occupancy, viz., the best use of the building, the condemnees objected and the court sustained their objections. As we have said the court permitted the United States to get some items of evi-

dence into the record as to the costs of alterations, conversions or repairs, by way of cross-examination of condemnees' witnesses but would not allow the United States to prove this important element by way of witnesses offered by it. This resulted in limiting the government unduly in the prosecution of its case and constituted prejudicial error.[7] We do not mean to say, however, that the admission or non-admission of details relating to alterations, repairs or conversion, does not rest within the sound legal discretion of the trial court. The trial court should, of course, eliminate proof of collateral issues which would tend to obscure the real issue, namely, the value of the property. See Wigmore on Evidence, Vol. VI, 3rd ed., Sec. 1904.

We come now to consideration of the assignments of error which deal more particularly with rulings of the court on questions of evidence.

(4) One of the witnesses for the United States was Bradford G. Storey, a mechanical engineer. Storey testified on direct examination to the condition of the plumbing and heating systems at the Penn Athletic Club at the time he examined them, which was only two days after the property was condemned. He stated that these systems were not in good condition in specifying particulars. After cross-examination counsel for the United States examined Storey again, asking him whether subsequent events in any way justified or confirmed his opinion as to the condition of plumbing and heating systems as he had found them at the time of his original inspection. Storey testified that he examined pipes and radiators after the contractors had entered the building and begun their construction work. The court itself proceeded to examine Storey and concluded that the contractors' workmen had "affected" the plumbing and heating systems and therefore the condition of these systems was not the same as at the original date of the taking. On the basis of this conclusion, the court, at the request of condemnees' counsel, struck out all of Storey's re-direct testimony. The United States asserts this ruling as error.

Storey testified that his examination of the bared piping, after the contractors had begun work, bore out the conclusion he had previously come to about the condition of the plumbing and heating systems during his initial inspection. This is proper and relevant testimony. The original inspection had been without benefit of an actual examination of some of the piping, which was largely concealed. A witness may state that his conclusion on an initial examination was confirmed by later events, when additional information is

7. Past cost of repairs already performed by an owner is not admissible as direct evidence of the value of the property condemned. See Kinter v. United States, 3 Cir., 1946, 156 F.2d 5, 172 A.L.R. 232. In this case the owner attempted to prove the lump sum total of all costs incurred by him over a period of years for repairs and improvements as pertinent to the question of fair market value. But on the other hand, cost of repairs is admissible as evidence of income earned by a property, which in turn is admissible as evidence of value. See 5 Nichols, Eminent Domain, Sec. 20.4 (1952) and cases cited.

In the case at bar, the United States sought to introduce evidence of the estimated cost of the repairs and alterations which would be necessary to put the Penn Athletic Club into tenantable condition for single-tenant occupancy, witnesses for the condemnees having already testified that single occupancy was the most desirable one, on the ground that a prospective purchaser would have to consider such cost in deciding what to pay for the property. The question of conversion and repair costs was especially pertinent because, as we have said, several experts had testified that the highest and best use to which the building could be put, viz., single-tenant occupancy as an office building, was not the same as the purpose for which it had originally been built, viz., a club. All considerations which fairly play a part in the bargaining between a willing seller and a willing buyer should be taken into account in a condemnation proceeding. See Olson v. United States, 1934, 292 U.S. 246, 257, 54 S.Ct. 704, 78 L.Ed. 1236. The estimated cost of repair and conversion was therefore admissible into evidence.

available. See United States v. Brooklyn Union Gas Co., 2 Cir., 1948, 168 F.2d 391, 397.[8] The fact that the contractors had "affected" the plumbing and heating system by replacing some of it strongly confirmed Storey's original diagnosis of its bad condition as it was at the time of the witness's original inspection. This is clear from the record. Storey's evidence on re-direct examination was admissible and should have been admitted. The ruling of the court striking it out constituted prejudicial error. The court refused to allow the United States reasonable latitude in proving this phase of its case.

(5) As part of condemnees' case, Albert M. Greenfield, an expert real estate broker, testified on direct examination that the phrase "market value" as ordinarily used in connection with tax assessments of real estate did not have the same meaning as the term "fair market value", as employed in connection with sales of real estate. "Market value" in connection with tax assessments was almost always the lower of the two. As part of its case, the United States sought to introduce the evidence of Martin L. Steiger, a lawyer and a tax assessor, in order to rebut Greenfield's testimony as to the meaning of these two terms. The court refused to hear Steiger in rebuttal, on the ground that only an expert who was a real estate broker was competent to rebut Greenfield's testimony. The court did, however, admit a stipulation of counsel providing that one of the condemnees (the record title holder of the property) had filed a request for reduction of taxes for the years 1949, 1950 and 1951 in which he had stated that the market value of the condemned property for the purposes of assessment was $1,-250,000.

The general rule is that the qualification of a proposed expert witness is a matter to be ruled upon by the trial judge, and may not be reviewed on appeal except for manifest abuse of discretion. Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825, 829. On the other hand, it is clear that a court of appeals may review the ruling of the trial court if the trial court applied incorrect principles in deciding not to hear a particular expert witness. See Bratt v. Western Airlines, 10 Cir., 1946, 155 F.2d 850, 853, 166 A.L.R. 1061. We think the present case comes within the ruling in the Bratt case.

The United States proposed to ask Steiger: " * * * as a lawyer and a member of the Board of Assessors—what is the meaning of market value with relation to assessment?" On objection by condemnee's counsel, the court ruled that Steiger was not competent to testify on this question because he was not engaged in the real estate business.

Government counsel did not limit the question, and hence the offer of proof, to the meaning of "market value" among real estate brokers; nor could the court properly insist that the government's witness be a real estate broker on the ground that Greenfield had testified to the meaning of the phrase "market value" among real estate brokers only. Greenfield's testimony was not so limited. He had testified originally as to the meaning of market value among real estate brokers, but under questioning by condemnees' counsel he went further and expressed views on the meaning of market value to tax authorities.[9] Under these circumstances the United States should have been allowed to present the evidence of a tax assessor in rebuttal. The point in issue was the use of the

8. The Court of Appeals for the Second Circuit stated:

"The question then becomes one whether deductions as to the future may be checked up by the actualities as they have happened. It would seem an eerie conclusion that a court must resort to guess, closing its eyes to reality, when

its decision must actually be formulated after the true facts have become available."

9. "Q. Now to your knowledge has this distinction been accepted and acted upon by real estate people generally and the taxing authorities in particular? A. It has."

phrase "market value" in tax assessment proceedings, as understood by both taxpayers and tax assessors. On this issue, both real estate brokers and real estate tax assessors were equally competent to testify.

 The issue here is not really one of qualifications of the offered witness as an expert. The witness was offered as a lawyer and a tax assessor, and the condemnees did not attack his qualifications as such. When the qualifications of an offered expert are in dispute, we stand on our opinion in Trowbridge v. Abrasive Co. of Philadelphia, supra, that the ruling of the trial judge should seldom be reversed on appeal. But the present situation is clearly of a different sort. The original witness having testified to a matter within the rebuttal witness' particular field of expertness the rebuttal witness should testify.

The whole point of this part of Greenfield's testimony as a witness for condemnees was that "market value" in tax assessment proceedings almost invariably was lower than "fair market value" among buyers and sellers. This was the only evidence of the meaning of the phrase "market value" in tax proceedings at the time the United States offered Steiger as a witness. Therefore, when the jury learned from the stipulation earlier referred to that the record owner of the property had estimated its "market value" for tax purposes as late as the tax year 1951 at $1,250,000, the only effect the jury could give to that fact was that the owner's estimate of the market value of the property was a higher figure. The United States should have been allowed to rebut this inference, if it could.[10] The exclusion of Steiger's testimony seriously prejudiced the government's case.

 (6) The final assignment of error asserts that the trial court refused

to hear certain evidence of depreciation of the condemned property admissible on the issue of replacement cost. Replacement cost is admissible as evidence of value in condemnation proceedings and was so employed by the condemnees in the instant case. The condemnees, however, based their case primarily upon market value of the condemned property, and introduced evidence of replacement value only incidentally.

 The United States is correct in stating that when replacement cost is used as evidence of value depreciation must be taken into account. United States v. Boston Cape Cod & N. Y. Canal Co., 1 Cir., 1921, 271 F. 877, 889; In re United States Commission, 1924, 54 App. D.C. 129, 295 F. 950, 954–959. But at no time when the condemnees introduced evidence of replacement cost did the United States attack that evidence because depreciation had not been taken into account. The United States could of course have objected at the time but did not. The assignment will not be considered as constituting reversible error since it lacks the foundation of an objection in the court below.

In conclusion we state that we are of the opinion that the court below unduly limited the United States in the presentation of its evidence with a result substantially prejudicial to its case.

For the reasons stated the judgment of the court below will be reversed and a new trial ordered.

GOODRICH, Circuit Judge (dissenting).

It seems to me that the errors which are relied upon for reversal are not of sufficient consequence to require another trial of the case in which the questions were thoroughly and, to me, fairly covered in the original litigation.

10. Presumably the Government could. "* * * [S]ubstantially the same definition of market value has been adopted by the Pennsylvania Courts in tax assessment cases [as in federal eminent domain cases] * * *." United States v. Cer-

tain Parcels of Land in City of Philadelphia, 3 Cir., 1944, 144 F.2d 626, 629. See Algon Realty Co. Tax Assessment Appeal, 1938, 329 Pa. 321, 198 A. 49; Hudson Coal Co. Appeal, 1937, 327 Pa. 247, 193 A. 8.