240 F.2d 715
 George W. STEWARD, Jr., Appellant,
v.
The ATLANTIC REFINING COMPANY, Defendant and Third-Party
Plaintiff, Terminal Transport Company and Charles
T. Banks, Third-Party Defendants.
Elmer ROBINSON
v.
The ATLANTIC REFINING COMPANY, Defendant and Third-Party
Plaintiff, Terminal Transport Company and Charles
T. Banks, Third-Party Defendants.
Kenneth DAVIS
v.
The ATLANTIC REFINING COMPANY, Defendant and Third-Party
Plaintiff, Terminal Transport Company and Charles
T. Banks, Third-Party Defendants.
Edward W. HULTZ
v.
The ATLANTIC REFINING COMPANY, Defendant and Third-Party
Plaintiff, Terminal Transport Company and Charles
T. Banks, Third-Party Defendants.
 Nos. 11883-11886.
 United States Court of Appeals Third Circuit.
 Argued Nov. 12, 1956.
Decided Jan. 17, 1957.
Rehearing Denied Feb. 6, 1957.
 
 George E. Beechwood, Philadelphia, Pa., for appellants.
 Otto Wolff, Jr., Philadelphia, Pa., for appellee.
 Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.
 STALEY, Circuit Judge.
 
 
 1
 These appeals arise out of a maritime collision which occurred early on the morning of May 22, 1952, in the Tinicum range of the Delaware River. The tankship Atlantic Dealer, owned and operated by the Atlantic Refining Company (hereinafter called 'defendant') was proceeding up the Tinicum range on its journey from Texas to Philadelphia. The tug Patco was proceeding downstream towing the barge Patoil on her port side, and the barge Patterson III on her starboard side, so that the flotilla formed the letter 'V'. The collision occurred between the Atlantic Dealer and the barge Patoil in such fashion that the barge was damaged and the tug Patco was sunk. Captain William C. Eggers, Russell Lynch, and John Hall, all personnel aboard the Patco, lost their lives; three civil actions were brought by their personal representatives against defendant. Four other suits were instituted against defendant to recover damages for personal injuries to other personnel of the flotilla. The seven cases were consolidated for trial to a jury on the issue of liability because of common questions of fact and law. In accordance with Rule 49(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., the jury answered certain specified interrogatories, upon the basis of which the district court directed verdicts in favor of defendant.[1] The three death claimants filed motions in the district court for a new trial. The four personal injury cases here on appeal were consolidated for briefing and argument pursuant to this court's order of July 9, 1956.
 
 
 2
 Before the civil actions came up for trial, the Marine Board of Investigation of the United States Coast Guard conducted its accustomed inquiry into the maritime disaster, pursuant to Section 239 of Title 46 of the United States Code. The statutory purpose of the board is to investigate misconduct or negligence on the part of licensed officers and to take whatever action deemed appropriate, including revocation or suspension of licneses. The findings of such boards are, of course, not admissible in subsequent civil actions. The Charles Morgan, 1885, 115 U.S. 69, 77, 5 S.Ct. 1172, 29 L.Ed. 316. See also Griffin on Collision § 268 (1949).
 
 
 3
 The appellants' various allegations of trial error include (1) permitting over the objection of plaintiffs Captain Lewis H. Shackelford, who was chairman of the Coast Guard Board which investigated this particular collision, to give expert testimony on behalf of defendant, and (2) the district court's refusal to permit plaintiff to introduce certain expert testimony to rebut expert testimony produced by defendant. Other points raised by appellants need not be discussed, since those enumerated will required reversal.
 
 
 4
 It is urged on behalf of plaintiffs that Captain Shackelford was called by the defense for the primary purpose of impressing the jury with the fact that the findings of the Coast Guard board of which he was chairman favored the position of the defense; therefore, his very appearance was prejudicial error. The explanation advanced by the defense, on the other hand, was that Captain Shackelford was called upon solely for the purpose of giving expert testimony concerning the functioning of course recorders and the elements necessary for an accurate plotting of a ship's course.
 
 
 5
 A reading of the record leaves us with no doubt that prior to Captain Shackelford's testimony the jury was well aware that the Coast Guard board had conducted an investigation into the facts and causes of the collision. It is not denied by appellee that throughout the trial Captain Shackelford gave technical advice to defense counsel within the view of the jury.
 
 
 6
 At the very beginning of the examination of Captain Shackelford there was created about him an atmosphere of official authority. On direct examination he was asked as follows:
 
 
 7
 'Q. Now, Captain, you were Chairman of the Marine Board of Investigation of the Coast Guard who investigated this accident? A. I was.
 
 
 8
 'Q. You were Chairman of that Board? A. That is correct.
 
 
 9
 'q. Are you here under subpoena? A. I am.
 
 
 10
 'Q. Before agreeing to testify in this case as an expert did you get the permission from your former superior Coast Guard officers in Washington to testify? A. I did.'
 
 
 11
 Thus his official position with regard to this collision was made unmistakably clear by the questions asked concerning it. The defense explains that these questions were asked to identify the witness to opposing counsel. This explanation loses force in view of the fact that the same counsel at the civil trial were present also at the board's investigation and would certainly recognize the chairman of that board. The testimony also conveys the thought to the jury that since the defense subpoenaed[2] Captain Shackelford it had nothing to fear from the findings he might have made as board chairman. Finally, the fact is brought to the attention of the jury that the testimony of a board chairman in a subsequent civil action is at least unusual enough that permission of his superiors in Washington would be needed. And with permission emanating from the nation's capital comes the final touch of official sanction for Captain Shackelford's appearance on behalf of the defense.
 
 
 12
 The expert testimony given by Captain Shackelford was of no great moment, considering the fact that any number of qualified mariners were no doubt available to testify about the functioning of course recorders. This fact, coupled with the questions asked making plain his official role in the investigation of this collision, compels us to conclude that the overall impression created by his testimony was that the government's view of the accident was in accord with that of the defense. And even though this was not the real purpose of the defense in summoning as a witness, that impression was created nonetheless effectively, and with no less prejudice. It was, therefore, error to permit Captain Shackelford to so testify, and such error is not remedied by explanations and admonishments of the court that the jury disregard the official position of the witness. The case of The Charles Morgan, supra, forbids the use of the findings of the Coast Guard board in a subsequent action based upon the same collision. It was no less error for the district court to permit the defense to do by indirection what it is forbidden to do directly.
 
 
 13
 The plaintiffs also object to the ruling of the district court refusing to admit expert evidence in rebuttal of the expert testimony presented on behalf of the defense.
 
 
 14
 It is the usual rule that questions concerning admissibility of expert opinion are addressed to the sound discretion of the trial court. Experts may testify on a particular subject if the trial court determines that such specialized opinion is necessary to aid the jury in a full understanding of the issues involved. 8 Cyclopedia of Federal Procedure § 26.381 (3rd ed., 1951). And the testimony to be admissible should touch upon a crucial issue and not deal with collateral matters alone.
 
 
 15
 The actual course which the Atlantic Dealer sailed up to the point of collision in the Tinicum range is an obvious focal issue in this case. Any determination of negligence or fault must of necessity be predicated in part upon the position of the vessels before and at the place of collision. Both sides realized this essential fact; and to vindicate its version of the accident, the defense requested Captain Barr, the master of the Atlantic Dealer, on direct examination to plot the course of his ship on a chart of the Delaware River. This Captain Barr did by reference to the course recorder of the Atlantic Dealer:
 
 
 16
 'Q. Captain, will you plot on this enlargement of this chart which we have here what the course recorder shows, your headings and turns-- do you think you can do that? A. Yes, sir.
 
 
 17
 'Mr. Reilly (Plaintiffs' counsel): I think that the plotting of the course by the Captain should really be done in the presence of the jury, even though it takes some time. I thing this is probably the most important part of the testimony, and I think it should be done--
 
 
 18
 '(Witness plots on chart as directed.)
 
 
 19
 'Mr. Wolff: Have you finished, Captain?
 
 
 20
 'The Witness: Yes, sir.
 
 
 21
 'By Mr. Wolff:
 
 
 22
 'Q. Now Captain, you have finished noting the course on the chart, have you? A. Yes, sir.'
 
 
 23
 Captain Barr testified as an expert when he interpreted the markings of the course recorder of the Atlantic Dealer, and from that course recorder plotted the path of his ship to the spot of the collision. Counsel for plaintiff cross-examined Captain Barr extensively as to the factors he took into account in making his plot on direct examination. These variable factors included the speed of the ship at various points and also the rate of deceleration. Using as a starting point the place of collision and taking into consideration the various factors which Captain Barr enumerated, plaintiffs' counsel requested Captain Barr to plot the course backwards. The witness refused to do so, contending that the speeds he testified to were mere approximations and that the result derived from an attempted plot based upon those factors would create a 'preposterous' result,[3] which was obviously that the vessel would be charted as being out of the channel through part of its journey.
 
 
 24
 On direct examination, Captain Barr plotted the course of the Atlantic Dealer with certainty. However, when faced with the prospect on cross-examination of plotting the same course from the point of collision, the variable factors, which were certain enough for the plot on direct examination, became insurmountable obstacles to an accurate charting of the course.[4]
 
 
 25
 In order to rebut the expert opinion of Captain Barr, plaintiffs called Captain Quistgward for the purpose of getting his expert testimony on the question of whether an accurate plotting of a ship's path could be made from her course recorder, taking into account the variable factors of speed, wind, etc. The defense objected to the question on the ground that the variable factors were too conjectural to admit of an accurate answer. The objection was sustained. We think this was error, in view of the fact that Captain Barr was permitted to chart the course of his ship on direct examination, and especially because Captain Barr was unable to plot the course on cross-examination. It should have been available to plaintiffs to produce their own expert to testify as to whether an accurate charting of the course was possible with the instruments and information on hand, and even to chart that course if it so desired.
 
 
 26
 We are in accord with the general principle that the qualification of an expert is a preliminary question for the trial court, and its judgment is conclusive unless clearly erroneous as a matter of law. Stillwell & Bierce Mfg. Co. v. Phelps, 1889, 130 U.S. 520, 527, 9 S.Ct. 601, 32 L.Ed. 1035; Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825, 829. But this case does not present the question of the qualifications of an expert. It presents rather the issue of the exclusion of certain expert testimony in rebuttal from a witness whose qualifications are unquestioned. As such, this case is controlled by our decision in Hickey v. United States, 3 Cir., 1953, 208 F.2d 269, 279, certiorari denied 1954, 347 U.S. 919, 74 S.Ct. 519, 98 L.Ed. 1074. In that eminent domain case it was held that since an expert for the condemnees testified as to the meaning of 'market value,' the trial court's refusal to permit a government expert to testify on the same subject in rebuttal was reversible error.
 
 
 27
 It was perfectly proper for the district court to permit Captain Barr to testify as an expert on direct examination about the proper interpretation of the course recorder. The translation of the markings of a course recorder into a chart of the ship's path is properly an area in which laymen need the assistance of expert opinion. Griffin on Collision 274 (1949). However, once the court had received Captain Barr's testimony, it should have permitted the plaintiff to introduce expert opinion in rebuttal. Hickey v. United States, supra. See also Ball v. U.S. Express Co., 32 App.D.C. 177, 185 (1908); Hall v. Nagel, 1942, 139 Ohio St. 265, 39 N.E.2d 612, 615. This conclusion is more logically forceful in view of the impeaching effect of Captain Barr's refusal to plot the course on cross-examination.
 
 
 28
 Our disposition of the case renders it unnecessary to consider the various other allegations of error.
 
 
 29
 The judgments of the district court will be reversed and a new trial ordered.
 
 
 
 [1]
 The Atlantic Refining Company had joined as third-party defendants Terminal Transport Company, the owner of the tug Patco, and Charles T. Banks, the demise charterer of the tug. The actions against the third-party defendants were dismissed consistent with the verdict in favor of the Atlantic Refining Company
 
 
 [2]
 To subpoena an expert witness for one's own side tends to imply that his testimony is being given under compulsion. It is unusual to subpoena him in the case of a private litigant. See Pennsylvania Co. for Insurances, etc. v. City of Philadelphia, 1918, 262 Pa. 439, 105 A. 630, 2 A.L.R. 1573; Cold Metal Process Co. v. United Engineering & Foundry Co., D.C.W.D.Pa.1938, 83 F.Supp. 914, Co., D.C.W.D.Pa.1938, 83 F.Supp. 914,
 
 
 [3]
 'By Mr. Reilly:
 'Q. Now, Captain Barr, when we broke off for our luncheon recess, I had asked you to plot on this chart your course working backward from the point of collision, since that was a known point which we had fixed in your testimony, taking this as the point of collision, and asked you to plot it backward using the information which you had testified to this morning, partly with certainty from your course recorder and partly from your best estimate, basing this upon your testimony that in the last three minutes before the collision before reaching this known starting point, that in the last three minutes you had been on a course of 90 degrees, then reduced or decelerated the speed, and during that minute prior to that you were on a course of 85 degrees for one minute at full speed, and during the two minutes before that you were on a course of 80 degrees, again at full speed, and so forth, going back I asked you to plot your course.
 'Now, will you show us what you plotted?
 'A. Mr. Reilly, I am in a position now where you are trying to get me to reduce this thing to a mathematical equation and come out the same at both ends with certain data that is accurate and correct and other data that is totally inaccurate, or estimates, and we can't arrive at any accurate idea at all.
 'Q. All right. What conclusion did you arrive at as your best estimate of your reduced speed for the period three minutes prior to the collision? What is your answer and what is the basis of your plot? A. I am unable to plot this.'
 
 
 [4]
 The record discloses the position of the defense as to Captain Barr's in ability to chart the course on cross-examination:
 'We covered this over and over again. The witness says he can't make an accurate plot without knowing exactly what his speed was, and his exact speed cannot be determined. That seems to settle that.'