Donald S. NASH and Sylvia K. Nash,
Appellants,

v.

D. C. REDEVELOPMENT LAND
AGENCY, Appellee.

D. C. REDEVELOPMENT LAND
AGENCY, Appellant,

v.

Donald S. NASH and Sylvia K. Nash,
Appellees.

Nos. 20410, 20485, 20491.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 12, 1967.

Decided Oct. 23, 1967.

Petition for Rehearing En Banc in
No. 20491 Denied April 19, 1968.

Mr. William T. Hannan, Washington, D. C., with whom Messrs. Joseph F. Castiello, Ralph F. Berlow and Kent D. Thorup, Washington, D. C., were on the brief, for appellants in Nos. 20,410 and 20,485 and appellee in No. 20,491.

Mr. William M. Cohen, Atty., Dept. of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., and Mr. Roger P. Marquis, Atty., Dept. of Justice, were on the brief, for appellant in No. 20,491 and appellee in Nos. 20,410 and 20,485.

Before BAZELON, Chief Judge, and McGOWAN and TAMM, Circuit Judges.

PER CURIAM:

These are cross-appeals from a condemnation judgment of the District Court making an award for three parcels of land. The landowners' appeal asserts that the District Court erred in proceeding with the condemnation proceedings before determining (1) whether certain alleys had been closed and thereby made part of the condemned property, and (2) whether the current zoning classification was correct.[1] In the other appeal, the condemnor Redevelopment Land Agency (RLA) contends that the District Court erred when it admitted evidence of an allegedly unconsummated offer of settlement to show market value.[2]

---

1. On the same day as condemnation was begun, the landowners filed an independent suit for equitable relief, alleging ownership of the alleys and that the subject property had been unlawfully rezoned.

2. The offer was made by a landowner to the RLA in respect of a tract of land which was in the same project area and condemned at the same time as the land here in suit.

The district judge concluded that the alleys were not closed because the Commissioners of the District of Columbia had not taken the necessary action to close them.[3] On the zoning issue, he held that the zoning and condemnation cases could not be effectively tried together. Therefore, he did not deal with the merits of the zoning classification but did allow the owners to introduce evidence of the probability of rezoning and that the land was currently used as a parking lot, a non-conforming use.[4] With regard to the second appeal, the District Court held that the evidence of the condemnation settlement indicated an agreed price and not a mere naked offer, and that it was admissible when offered by the landowner. It regarded the essential issue as one of comparability, as to which it permitted the condemnor to make a full showing.

■ We affirm, as against both appeals, the judgment entered in the District Court. The discretion exercised by the district judge with respect to the zoning and alley questions so plainly warrants no correction by us that we do not pursue the matter further. The admissibility of the settlement, however, merits more detailed comment. The owners' expert witness testified that his original estimate of the value of the neighboring junkyard was that it was worth $5.00 a square foot, and that he later learned that it had been sold to the RLA for $38,-000.[5] On cross-examination, doubt appeared as to whether the settlement of the junkyard transaction had been completed. The RLA thereupon moved for a mistrial.[6]

The district judge asked both attorneys to approach the bench and discuss the merits of the motion. The RLA's attorney represented to the judge that the $38,000 offer from the junkyard owners had not been finally accepted by the Justice Department, which has final authority in this area, and presented evidence to this effect.[7] The judge then stated that if this was only a naked offer of settlement it was inadmissible. The landowners' attorney responded by pointing out that both the RLA and the junkyard owners were represented by counsel who had negotiated what the landowners

3. The applicable statutes are 7 D.C.Code §§ 305, 401 (1967).

4. The condemnees purchased this property in 1957. In 1958 the zoning classification was changed from C–2 to R–4. The owners contested this rezoning classification twice in 1958 and both times their application for a change of classification was denied without a hearing. The further remedies available to them were not pursued.

5. On the basis of $38,000, the land would be worth about $6 a square foot. But this figure does not take into consideration any of the appurtenances and is obtained merely by dividing $38,000 by the size of the junkyard, 6,345 square feet. The owners wanted to introduce this because the RLA had only offered them $2 a square foot for their property, which was similarly situated and had the same zoning classification. The only apparent difference was that the property in suit was used as a non-conforming parking lot, whereas the other was a non-conforming junkyard, a factor which the condemnor stressed in its evidence of non-comparability.

6. The RLA also urged upon the district court and this court that evidence concerning the junkyard transaction was inadmissible because it involved a sale made under the threat of condemnation. The RLA relies on District of Columbia Redevelopment Land Agency v. 61 Parcels of Land, 98 U.S.App.D.C. 367, 235 F.2d 864 (1956), which held that evidence of comparable sales offered by the RLA were inadmissible because the sales were made under condemnation. The district court rejected this argument, and so do we. The reasons which disable a condemnor from putting in evidence of purchases it has made in settlement of condemnation suits have no application to a landowner who offers such evidence himself.

7. The offers of landowners are submitted to the Justice Department in the form of a stipulation and when the Government accepts the offer it signs the stipulation. The RLA's attorney presented this stipulation which was signed by the junkyard owners but not by the Justice Department.

thought was a final sales figure. Moreover, he said, they had heard nothing to the contrary since the negotiations. The RLA's attorney then admitted that his office had recommended to the Justice Department that the offer be accepted, and that he considered it a fair settlement, but urged the offer was still inadmissible because it had not been finally accepted by the Justice Department. The judge told the RLA's counsel he could not understand why his office was ready to pay $5 a square foot for the junkyard and only $2 in this case. The explanation given by the RLA was that its appraisers considered a junkyard more valuable than a parking lot. The judge said this could be shown by evidence and argued to the jury, and denied the motion. Thus, the judge apparently concluded that, although the processing of the recommendation within the Government had not reached the stage of final acceptance in the formal sense of the completion of all the governmental paper work, the $38,000 was much more than a simple offer and could fairly be admitted.

This conclusion is substantiated by the later testimony of Mr. Blackwelder, the attorney who represented the RLA in the junkyard condemnation litigation and in the negotiations leading to its settlement.[8] The RLA used this witness to attack again the finality of the $38,000 offer in that he stated the offer was conditioned upon the junkyard owners being permitted to remove certain fixtures and the Government had not agreed to this. On cross-examination, Mr. Blackwelder explained that the junkyard had an RLA appraised value of about $39,400, which included the value of the fixtures. He admitted that the offer of $38,000 was not so different from the appraisal as to cause it to be rejected, and that he had recommended its acceptance. He further characterized his experience to be that, in the normal course of events, his recommendations were accepted by the Justice Department. Thus, in light of the whole record, we find no necessity to hold that the district judge's action was reversible error.

Although the figure eventually paid by the RLA,[9] $39,875, was slightly different from the original offer, it was not significant enough to justify reversal. The jury [10] was not misled by the testimony in issue because the value of the land based on the final settlement was $5.30 a square foot.[11] Moreover, the district court correctly left the question of comparability with the jury, and the RLA was given ample opportunity to explain the disparity between the value placed by RLA on the junkyard and the property here in suit.

Affirmed.

TAMM, Circuit Judge (dissenting):

I would reverse and remand this case for a new trial. In my opinion, the ad-

---

8. Both Mr. Blackwelder and Mr. Liotta, who represented the RLA in the instant case, are attorneys employed by the Department of Justice.

9. The final balance was not struck until after the completion of the condemnation proceedings. Therefore, the difference between the final settlement and the original offer was first raised on appeal. The difference is explained by the fact that the value of certain fixtures was included in the final settlement whereas it was not in the offer made by the owners of the junkyard.

10. It is important to note that the jury consists of people who have some expertise in real estate valuation. Also, besides hearing all the evidence, the jury saw the property and the surrounding area.

11. The $5.30 figure was ascertained in the following manner. The fixtures were appraised to be worth from $4750 to $6000. Assuming that they were worth $6000 and subtracting this from $39,-875 and dividing the result by the size of the junkyard, 6345 sq. ft., the value per square foot is $5.30. This seems to be a fair figure because we are giving the RLA the benefit of the doubt by assuming that the fixtures were worth the highest figure, which tends to reduce the amount paid for the land. Furthermore, the RLA appraised the property to be worth $39,400 and, subtracting the $6000, this is still within the $5.00 range.

mission of testimony by the landowners' expert appraisal witness relating to an unconsummated settlement offer defined only in the terms of the landowners' statement of the figure he would accept in settlement of the case constituted prejudicial error. Since the landowners' expert witness predicated his ultimate appraisal upon this unconsummated settlement figure, I believe that this witness' testimony was without any evidentiary value. Without the testimony of this witness, the only testimony in the record is that of the appellee's expert witness. Under these circumstances, I believe the case should be remanded for a new trial.

Before BAZELON, Chief Judge and DANAHER, BURGER, WRIGHT, McGOWAN, TAMM, LEVENTHAL and ROBINSON, Circuit Judges, in Chambers.

### ORDER

PER CURIAM.

On consideration of appellant's petition for rehearing *en banc* in No. 20491 and of appellees' answer thereto, it is

ORDERED by the Court *en banc* that appellant's aforesaid petition is denied.

McGOWAN, Circuit Judge, with whom BAZELON, Chief Judge, concurs, votes to deny appellant's aforesaid petition for the reasons set forth in the attached statement.

DANAHER, BURGER, and TAMM, Circuit Judges, would grant appellant's petition for rehearing *en banc*.

STATEMENT OF CIRCUIT JUDGE McGOWAN EXPLAINING WHY HE BELIEVES THE PETITION FOR REHEARING EN BANC SHOULD BE DENIED

As a participant in the *per curiam* decision in respect of which the Government seeks rehearing *en banc,* it may be useful to spell out at some length the reasons why I have voted to deny that request. The panel opinion did not deal with the matter in detail because of the feebleness of the assault mounted by the Government against the trial court's action. The petition for rehearing is a major, albeit belated, effort; and it warrants an enlargement of the discussion on our part.

This was a condemnation action by the Redevelopment Land Agency to acquire several contiguous tracts of land for a housing development. In the trial of this particular action, the expert witness for the condemnee first testified that the land was worth approximately $5.00 per sq. ft., as contrasted with the $2.00 per sq. ft. which had been testified to by the Government's expert. He was then asked if there had been any other transactions in the vicinity and, over objection, he was allowed to testify that the condemnor had paid $5.00 a sq. ft. for another tract approximately 100 feet away. The Government attorney, after saying "I think it was a fair price of course, probably compromise," objected to its admission solely on the ground of District of Columbia R.L.A. v. 61 Parcels, 98 U.S.App.D.C. 367, 235 F.2d 864 (1956). He characterized that case as requiring the exclusion of this evidence because it involved a sale to the Government of land "right in this project area." The District Judge questioned whether this was a necessary conclusion. He said he could understand how a condemnee might well have reason to complain of such evidence when offered by the Government, since the condemnee was under the compulsion of condemnation. But, if the immediate condemnee chose to offer the evidence himself, he did not see the relevance of the compulsion principle. In any event, he finally concluded to admit the evidence, and to give the Government a full opportunity to show the non-comparability of the two properties. The Government took advantage of this opportunity, and the jury brought in a verdict eventually which was about midway between the $2.00 and the $5.00.

On appeal it was argued to us that no sale made in the shadow of condemnation can be admitted in evidence by anybody, because of the compulsion and coer-

cion inherent in the condemnation power. Two members of the panel were not satisfied that the District Judge had abused his discretion in the admission of evidence to a degree necessitating reversal. The dissenting judge was primarily concerned with a subsidiary point, namely, the question of whether the Government and the adjoining landowner had really arrived at a final meeting of the minds with respect to price. The majority were satisfied that, for the purpose in question, there had been such a meeting of the minds; and the majority did not, either in terms or in purpose, hold that an unaccepted offer would be admissible.

The Government now argues that the panel's ruling on admissibility is contrary to the law of the circuit. I am far from being convinced that this is the case. *61 Parcels* cannot be directly controlling because there it was the RLA which claimed error in the exclusion of evidence offered by it of the prices at which it had acquired comparable parcels. It was in that context that Judge Fahy, in his opinion in *61 Parcels,* undertook to define what would be the "compulsion, coercion or compromise" which must be negated by one who offers evidence of prior sales. He said there would be no such disqualification unless it appears that the sale was, among other things, "under pressure of the exercise of the power of eminent domain, or other coercion * * *." Since he was considering the admissibility of evidence offered by the *condemnor* as distinct from the *condemnee,* it seems reasonable that the coercion he was talking about was that which is felt by the party who is the object of the condemnation power, and not by the one who has it.

In considering Judge Fahy's comments in *61 Parcels,* account must be taken of Hannan v. United States, 76 U.S.App. D.C. 118, 131 F.2d 441 (1942). In that case the Government was securing land for the new War Department Building; and the trial court excluded evidence offered by certain condemnees of the prices which the Government had paid for other parcels in the condemned area. The court in *Hannan* said that it was not error for the evidence to be excluded for two reasons. First, the person who offers evidence of other transactions must establish preliminarily that the purchase was made "without compulsion, coercion, or compromise," and no such showing had been made. Secondly, said the court, the reception of evidence of this kind in each case is to be left to the discretion of the trial judge "[T]o the end that the jury may be placed in the best position to pass upon the ultimate question of fact. * * *" His discretion in each instance will not be disturbed "except for good reason." The court found that other evidence of private sales had come in, and concluded that, looking at the whole record, the jury was in a position to decide the question fairly.

Judge Stephens dissented in *Hannan* on the ground that, if the court was to say for the first time that the offeror of evidence of this kind must preliminarily qualify it as free from compulsion, the case should be retried and this opportunity given the condemnee. As to the outcome of such an effort, he said "[T]hat they can qualify it would seem hardly doubtful because the circumstances under which a condemnor would be under compulsion must be most unusual—since if a condemnor cannot purchase at a reasonable price he is at liberty to take the property by condemnation proceedings." Further, Judge Stephens felt that the majority, in a case where they appeared to recognize the discretion vested in the trial judge, had unnecessarily appeared to change the law of the circuit:

Upon the question whether in a condemnation proceeding evidence may be introduced as to the price paid by a condemnor for property similar to that in suit, there is a division of authority. The weight of authority outside this jurisdiction is that such evidence is inadmissible. But in Washington Home for Incurables v. Hazen, 1934, 63 App.D.C. 185, 70 F.2d 847, we adopted the minority rule and held the admission of such evidence proper.

We based our ruling upon O'Malley v. Commonwealth, 1902, 182 Mass. 196, 65 N.E. 30, in which the opinion for the Supreme Judicial Court of Massachusetts was written by Holmes, then Chief Justice of that tribunal. * * The theory of admissibility is that although evidence of a purchase by the condemnor of property similar to that involved in a condemnation proceeding is less persuasive on the issue of market value than evidence of a purchase by a stranger, there is no reason in principle why such evidence should not be admitted provided the purchase by the condemnor was made without compulsion; in short, it is held that objection to this type of evidence goes to its weight, not to its competency. Id. 76 U.S.App.D.C. at 121, 131 F.2d at 444.

In the *Washington Home for Incurables* case, cited by Judge Stephens, this court reversed the lower court for excluding evidence of other acquisitions made by the condemnor, and the court showed itself to be sharply aware of the differing positions in which a condemnee and a condemnor find themselves on the question of compulsion. It held that the District Commissioners could not be regarded as under any compulsion or coercion simply because they were proceeding to acquire properties through the use of the condemnation power.

The District operates under a quick-taking statute. 16 D.C.Code § 1353. Under that statute, the Government can and does proceed by depositing in court a sum of money which it considers to be the fair market value; and it simultaneously acquires title and right to possession. How it can be said to be under any significant compulsion to pay more for property than it is worth eludes me. I can understand why a condemnee might still insist that the Government's unilateral estimate of value should not come in against his objection, but, if he wishes to put it in, I cannot detect any element of coercion or compulsion that should invariably keep it from the jury's consideration.

The cases cited by the Government in other circuits seem to me something less than sharply focused;[1] and they do not deal with the realities of this problem in any way commensurable with what has been said in this circuit. Even if our present rule be taken to be that a condemnee offering evidence of this kind must preliminarily qualify it by showing that the Government is free of compulsion, reversal is hardly necessary in this case since the Government lawyer himself prefaced his objection to admissibility by characterizing the price as fair.

As to the RLA's claim that the panel has handed down a decision which is squarely in conflict with the existing law of the circuit, that depends upon how you define that law. The task of definition, as indicated above, is a very formidable one under the circumstances. After reading carefully the cases discussed above, I would have to answer somewhat as follows if anyone asked me what I thought the current law of the circuit is: The admission of evidence in condemnation cases is committed to the discretion of the trial judge. Where one party to a transaction involving comparable property is armed with the condemnation power, the court should be especially alert to the distortions of coercion. Jury verdicts will not be reversed unless, looking at the whole record, the reviewing court is convinced that the jury did not have a reasonable opportunity to determine the question of fair market value

1. The Government's citations are to cases in the Third, Fifth, and Eighth Circuits. The three latest of these are Hickey v. United States, 208 F.2d 269 (3rd Cir. 1953); Slattery Co. v. United States, 231 F.2d 37 (5th Cir. 1956); and Evans v. United States, 326 F.2d 827 (8th Cir. 1964). *Hickey* does not involve at all the offer by a condemnee of evidence of comparable acquisitions by the Government. *Slattery* states the principle contended for by the Government, but the condemnee still succeeded in getting the verdict reversed on other grounds. *Evans* cites *Slattery*, and then goes on to indicate that there was no evidence of the comparability of the respective properties to support the condemnee's offer of proof.

and that its conclusion is patently an unjust product of an unjust proceeding.

The justification for an *en banc* would presumably be that, if we are to have a rule that neither condemnee nor condemnor can put in evidence of a condemnor's other acquisions in the same area, a new and better theoretical formulation is necessary than the one the Government has given us thus far. The RLA is never very clear in its petition for rehearing *en banc* just what it would like to have us declare the general rule to be. It first talks about how admissibility should not be a one-way street—a suggestion which apparently did not impress the RLA when, after *Hannan's* exclusion of evidence offered by the condemnee, the RLA tried in *61 Parcels* to introduce evidence of its own acquisitions.

The petition subsequently seems to emphasize the compromise rationale. First it says that, because the Government accepted an offer of settlement of a pending condemnation action, the Government was under coercion to do so in order to be spared the trouble and expense of further litigation. I am not impressed with the severity of this asserted compulsion. Secondly, it refers to the evidentiary rule that evidence of compromise is inadmissible. It cites two cases for this proposition. Neither involves the condemnation problem. In Home Ins. Co. v. Baltimore Warehouse Co., 93 U.S. 527, 23 L.Ed. 868 (1876), it was held that, in a case involving the coverage of an insurance policy, the trial court did not err in excluding an unaccepted offer of compromise. Martello v. Hawley, 112 U.S.App.D.C. 129, 300 F. 2d 721 (1962), held that a settlement made by one of two joint tort-feasors should not be made known to the jury.

The problem we face does not lend itself very well to the compromise rule in other situations. Is there any real difference, for example, between a price arrived at by the Government and the land-owner before a condemnation suit is filed, and one which they fix upon during the pendency of the litigation?

It is the fact that one party is possessed of the power of condemnation which keeps this transaction in either case from being a true arm's length bargain. Whenever the Government decides to pay a certain price, it has arguably made an uncoerced judgment as to fair market value which is relevant in the trial of any other condemnation of related property, and which, when offered by the condemnee, the trial judge does not err in admitting, provided he gives the Government a full opportunity to show to the jury the differences between the two properties which explain the disparity in the Government's respective evaluations.